IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
_____

CANDY LAB, INC.,
a Nevada Corporation,

        Plaintiff,

v.

MILWAUKEE COUNTY, a municipal
corporation; MILWAUKEE COUNTY
BOARD OF SUPERVISORS; and
MILWAUKEE COUNTY DEPARTMENT
OF PARKS, RECREATION, AND
CULTURE,

        Defendants.
_____/

Case No. 17-_____

Hon.

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Candy Lab, Inc. ("Candy Lab AR"), by its attorneys Warner Norcross & Judd LLP and pursuant to Fed. R. Civ. P. 65, moves this Court to enter a preliminary injunction against Defendants Milwaukee County, the Milwaukee County Board of Supervisors (the "Board"), and the Milwaukee County Department of Parks, Recreation, and Culture. Candy Lab AR has suffered and continues to suffer irreparable harm from Defendants' adoption of Resolution 16-637 (the "Ordinance"), which purports to prohibit Candy Lab AR and all other game developers from publishing any "location-based augmented reality games" playable in the Milwaukee County Parks without first obtaining a permit. Because the Ordinance unconstitutionally restricts Candy Lab AR's and other developers' rights to free speech under the First Amendment, Candy Lab AR respectfully requests that this Court enjoin Defendants and their employees, agents, and representatives from enforcing the Ordinance. In support of this

Motion, Candy Lab AR submits the accompanying memorandum of law and the supporting

Declarations of Andrew Couch, Ori Inbar, and Mark Skwarek.


WARNER NORCROSS & JUDD LLP


Dated: April 21, 2017                By: /s/ Brian D. Wassom
                                         Brian D. Wassom
                                         Conor B. Dugan (*admission pending*)
                                         Ashley G. Chrysler (*admission pending*)
                                         2000 Town Center, Suite 2700
                                         Southfield, Michigan 48075
                                         248.784.5039
                                         bwassom@wnj.com
                                         conor.dugan@wnj.com
                                         achrysler@wnj.com

                                         *Attorneys for Plaintiff Candy Lab, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
_____

CANDY LAB, INC,                         Case No. 17-_____
a Nevada Corporation,
                                        Hon.
            Plaintiff,

v.

MILWAUKEE COUNTY, a municipal
corporation; MILWAUKEE COUNTY
BOARD OF SUPERVISORS; and
MILWAUKEE COUNTY DEPARTMENT
OF PARKS, RECREATION, AND
CULTURE,

            Defendants.
_____/

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I.     Candy Lab AR and Augmented Reality ................................................... 2

II.    The Diverse Marketplace for Mobile Augmented Reality Applications ................ 4

III.   Candy Lab AR's Newest Mobile Game, Texas Rope 'Em ..................................... 4

IV.   A Divided Board Adopts the Ordinance as a Knee-Jerk Reaction to
Pokémon Go .................................................................................................... 5

V.    The Vague and Overbroad Text of the Ordinance as Adopted ............................. 7

VI.   The Overbearing Permit Application Issued Pursuant to the Ordinance ................ 8

VII.   Penalties For Violating the Ordinance Include Fines and Imprisonment ............... 9

VIII. The Ordinance and Permit Application Apply to Texas Rope 'Em ...................... 10

STANDARD OF REVIEW ..................................................................................... 10

ARGUMENT ......................................................................................................... 10

I.     Candy Lab AR Will Suffer Irreparable Harm If an Injunction Is Not Issued ........ 10

a.     Texas Rope 'Em, Like All Video Games and Entertainment
Content, Is Speech Entitled to the Full Range of First Amendment
Protections ................................................................................................. 10

b.     The Ordinance Purports to Regulate Texas Rope 'Em ............................. 11

c.     The Ordinance Inflicts Irreparable Harm on Candy Lab AR By
Interfering With Its First Amendment Right to Free Speech ..................... 12

II.    Traditional Legal Remedies Are Insufficient to Protect Candy Lab AR
from Harm ....................................................................................................... 13

III.   Candy Lab AR Is Likely to Succeed on the Merits of its Claims ......................... 14

A.     The Ordinance Restricts Speech Before It Occurs and Constitutes
an Unconstitutional Prior Restraint ......................................................... 14

1.     The Ordinance Qualifies as a Prior Restraint ............................... 14

2.     Prior Restraints Are Presumed Unlawful and Nearly
Impossible to Justify ..................................................................... 15

i

3.      The Ordinance's Permitting Scheme Fails Prior Restraint Analysis........................................................................................16

B.      The Ordinance Fails to Give Adequate Notice of the Speech It Proscribes and Is Thus Unconstitutionally Vague ......................................19

1.      Vagueness Challenges Apply in Cases Involving First Amendment Rights ........................................................................19

2.      The Ordinance Is Unconstitutionally Vague and Overbroad.........20

C.      The Ordinance Discriminates Based on Content ......................................25

D.      The Ordinance Fails Strict Scrutiny............................................................26

1.      The Ordinance Serves No Compelling Interest ............................26

2.      The Ordinance Is Not Narrowly Tailored to Achieve These Interests ........................................................................................27

IV.      Both the Balance of Harms and Public Interest Weigh in Favor of an Injunction ..........................................................................................................29

CONCLUSION .................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page No.**

### Cases

*ACLU of Illinois v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) ................................................. 29

*Alexander v. United States*,
    509 U.S. 544 (1993) ............................................................ 14

*American Amusement Machinist Asociation v. Kendrick*,
    244 F.3d 572 (7th Cir. 2001) ............................................... 11

*Boos v. Barry*,
    485 U.S. 312 (1988) ............................................................ 27

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011) ............................................................ 10

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ................................................................ 30

*Butler v. Michigan*,
    352 U.S. 380 (1957) ............................................................ 27

*Cf. Cox v. New Hampshire*,
    312 U.S. 569 (1941) ............................................................ 18

*Citizens for a Better Environment v. City of Park Ridge*,
    567 F.2d 689 (7th Cir. 1975) ............................................... 12

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ......................................................... 26, 27

*City of Lakewood v. Plain Dealer Publishing Company*,
    486 U.S. 750 (1988) ............................................................ 17

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984) ............................................................ 26

*Coates v. Cincinnati*,
    402 U.S. 611 (1971) ............................................................ 21

*Cox v. Louisiana*,
    379 U.S. 536 (1965) ............................................................ 20

iii

*Dunn v. Blumstein,*
    405 U.S. 330 (1972)................................................................. 26

*Elrod v. Burns,*
    427 U.S. 347 (1976)................................................................. 12

*Entertainment Software Association v. Blagojevich,*
    469 F.3d 641 (7th Cir. 2006) ................................................ 28

*Flower Cab Company v. Petitte,*
    685 F.2d 192 (7th Cir. 1982) ................................................ 13

*Gillespie v. City of Indianapolis,*
    185 F.3d 693 (7th Cir. 1999) ................................................ 26

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)....................................................... 20, 21, 23

*Hague v. CIO,*
    307 U.S. 496 (1939)................................................................. 21

*Haig v. Agee,*
    453 U.S. 280 (1981)................................................................. 26

*Hatchett v. Barland,*
    816 F. Supp. 2d 583 (E.D. Wis. 2011)................................ 12, 14

*Joelner v. Village of Washington Park, Illionis.,*
    378 F.3d 613 (7th Cir. 2004) ................................................ 14, 30

*Jones v. Markiewicz-Qualkinbush,*
    842 F.3d 1053 (7th Cir. 2016) .............................................. 10

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952)................................................................. 11

*Lefkowitz v. Cunningham,*
    433 U.S. 72 (1977)................................................................. 26

*Linmark Associates, Inc. v. Willingboro,*
    431 U.S. 85 (1977)................................................................. 26

*Lovell v. Griffin,*
    303 U.S. 444 (1938)................................................................. 21

*NAACP v. Button,*
    371 U.S. 415 (1963)................................................................. 19

Case 2:17-cv-00569-JPS   Filed 04/21/17   Page 7 of 39   Document 6

*National People's Action v. Village of Wilmette,*
914 F.2d 1008 (7th Cir. 1990) ................................................. 13

*Nebraska Press Association v. Stuart,*
427 U.S. 539 (1976) ................................................................ 15

*New York Times v. Sullivan,*
376 U.S. 254 (1964) ................................................................ 30

*New York Times v. United States,*
403 U.S. 713 (1971) ........................................................... 15, 16

*Perry Education Association v. Perry Local Educators' Association,*
460 U.S. 37 (1983) .................................................................. 27

*Pleasant Grove City, Utah v. Summum,*
555 U.S. 460 (2009) ................................................................ 27

*R.A.V. v. City of St. Paul, Minnesota,*
505 U.S. 377 (1992) ................................................................ 25

*Reed v. Town of Gilbert, Arizona,*
135 S. Ct. 2218 (2015) ............................................................ 25

*Saia v. New York,*
334 U.S. 558 (1948) ................................................................ 21

*Schneider v. State,*
308 U.S. 147 (1939) ................................................................ 21

*Shuttlesworth v. City of Birmingham,*
394 U.S. 147 (1969) ....................................................... 17, 18, 21

*Skilling v. United States,*
561 U.S. 358 (2010) ................................................................ 20

*Smith v. California,*
361 U.S. 147 (1959) ................................................................ 20

*Special Souvenirs, Inc. v. Town of Wayne,*
56 F. Supp. 2d 1062 (E.D.Wis.1999) ................................... 17, 19

*Staub v. City of Baxley,*
355 U.S. 313 (1958) ................................................................ 21

*United States v. National Dairy Products Corporation,*
372 U.S. 29 (1963) .................................................................. 20

Case 2:17-cv-00569-JPS   Filed 04/21/17   Page 8 of 39   Document 6

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000)................................................................................................. 27

*Weigand v. Village of Tinley Park*,
  114 F. Supp. 2d 734 (N.D. Ill. 2000) ........................................................... 23, 26, 29

*Wiemerslage v. Maine Township High School Districkt*,
  *207, 29 F.3d 1149 (7th Cir. 1994)* ............................................................................ 23

*Zacchini v. Scripps–Howard Broadcasting Co.*,
  433 U.S. 562 (1977).................................................................................................. 11

## Rules

Fed. R. Civ. P. 65 ................................................................................................. 1, 10

## Other Authorities

*American Heritage Dictionary* (5th ed. 2016) ............................................................ 3

*Philosophical Investigations*  (G.E.M. Anscombe trans., Macmillan Publishing Co. 3d ed.
  1958) ........................................................................................................................ 23

*The Grasshopper: Games, Life, and Utopia* (1978) .................................................. 23

# INTRODUCTION

The specific subject matter of this case—location-based augmented reality gaming—has only recently entered into the public consciousness, but the legal issue at the core of this dispute is as old as the Republic itself. Fearing the publication of content they do not understand and find inconvenient, the municipal defendants chose simply to ban it instead. This impulse is commonplace in human experience, which is exactly why we have a First Amendment to the Constitution—to safeguard freedom of expression from the knee-jerk whims of politicians.

The Milwaukee County Board of Supervisors ("Board") was put off by the popularity of one location-based augmented reality game: the mobile application called "Pokémon Go." This overnight sensation led an unusually large number of people to visit parks and other public places in July 2016. Predictably, these atypical behavior patterns led to occasional instances of congestion and misbehavior, in Milwaukee County and across the world. Milwaukee was not the only municipality to react by stepping up enforcement of park hours and existing rules against littering and trespass. It has been, however, the only local government to date to go beyond these traditional municipal functions and attempt to dictate what content the *game developers* can and cannot publish. And not just the company behind Pokémon Go, either; the Board purported to *prohibit* the *publication* of *any* location-based augmented reality game that can be played in County parks—on pain of *fines and imprisonment*—without the County's permission, which can only be obtained after overcoming financially and logistically impossible hurdles.

At least, that is the most logical reading of the ordinance; its terminology is so vague and incoherent as to be impossible for software developers to reliably decipher what is and is not prohibited. That, of course, is another fatal flaw the ordinance has under the First Amendment.

Plaintiff ("Candy Lab AR") recently released a location-based augmented reality game called "Texas Rope 'Em." The game is playable in Milwaukee County Parks (among other places across the world), and the Department of Parks, Recreation, and Culture ("DPRC") has confirmed that it is subject to the new ordinance. Candy Lab AR faces the Sophie's choice of censoring its speech within the County, withdrawing the game from the marketplace, or risking financial ruin by attempting to satisfy the many conditions Defendants required before they will consider exercising their purportedly limitless discretion over such games.

This is an open-and-shut First Amendment case. Because the County's ordinance regulating location-based augmented reality games is a prior restraint on speech, is impermissibly vague, and is content-based discrimination (because it singles out only a particular form of speech—a subset of mobile applications), this Court should issue a preliminary injunction prohibiting the defendants from enforcing it pending the outcome of this litigation.

## BACKGROUND

## I.   Candy Lab AR and Augmented Reality

Candy Lab AR is an award-winning company that has been developing location-based and augmented reality ("AR") software company since 2011. Dec. of Andrew Couch ("Couch Dec.") ¶4. Generally speaking, location-based applications are those that track the real-time physical location of the device running the application in real time, and allow the user to interact with digital content based on the device's geolocation. *Id.* Candy Lab AR not only creates its own applications, but also licenses its proprietary software engine for use in "white label" location-based applications offered by other companies.[1] *Id.* ¶11.

---

[1] A "white label" application is an application produced by a developer for a customer that then markets the application under the customer's own brand.

Candy Lab AR's applications also feature an augmented reality component. *Id.* ¶5. AR is a medium of expression that combines digital information with the viewer's physical surroundings. *Id.* To "augment" something means "to make [it] greater as in size, extent, or quantity." *American Heritage Dictionary* (5th ed. 2016). AR, then, uses digital information to make a person's experience of the physical world "greater." Couch Dec. ¶5. Although the term "augmented reality" can describe the digital enhancement of any physical sense (including hearing and touch), it is most commonly applied to the sense of sight. *Id.*

The medium of AR is not conceptually new. Declaration of Ori Inbar ("Inbar Dec.") ¶12. A form of augmented reality with which many are familiar has been used for decades in sports broadcasting, especially  during television broadcasts of professional football games. *Id.* On the actual football field, there are no yellow or blue lines or statistical displays extending across the field of play. Instead, the lines are superimposed by the broadcasting company's technology in a manner that makes the data appear to the viewer as if it is physically present on the field. *Id.* Mr. Inbar's Declaration provides more examples of well-known AR content. *Id.* ¶¶13-27.

Like the lines on a football field, the AR component of Candy Lab AR's mobile applications consists of digital imagery that appears only on a screen. Couch Dec. ¶6. The applications superimpose images on a live video display from a mobile device's rear-facing video camera, creating the illusion that the image is physically present on the other side of the

device. *Id.* Examples of the AR features in Candy Lab AR's mobile applications are provided in the Mr. Couch's Declaration. *Id.* ¶¶7-10.

## II.     The Diverse Marketplace for Mobile Augmented Reality Applications

Developers have been publishing mobile applications that combine game mechanics, location sensing, and AR display features since at least 2009. Inbar Dec. ¶¶24-44; Dec. of Mark Skwarek ¶22. Also commonplace in today's mobile application market are location-based games without AR features, Inbar Dec. ¶32, and mobile AR applications for other, non-gaming purposes, such as art, navigation, and political speech. *Id*. ¶22; Skwarek Dec. ¶¶7-16.

In July 2016, Niantic released Pokémon Go. Couch Dec. ¶13. This mobile game uses location-sensing technology and (optional) AR imagery to create a game world in which players interact with digital content in designated geolocations ("game stops") and discover virtual creatures that are algorithmically generated in response to players' locations. *Id.* Pokémon Go quickly became one of the world's most popular mobile applications. Inbar Dec. ¶41.

## III.    Candy Lab AR's Newest Mobile Game, Texas Rope 'Em

In March 2017, Candy Lab AR announced the launch of the first location-based AR poker game, "Texas Rope 'Em!" *Id.* ¶15. The goal of Texas Rope 'Em is to beat the dealer in the popular poker variant "Texas Hold 'Em." *Id.* ¶16. Players begin the game with two of the five required playing cards. *Id.* To build their hands, players must carry their mobile device to game stops indicated on the game map to obtain a new card. *Id.* Once the player has set his or her hand, the cards are played against the dealer. *Id.* ¶17. If the player loses, he or she can try again. *Id.* Players who beat the dealer win points and other prizes. *Id.*

4

 

*The map screen of Texas Rope 'Em showing playable game stop locations in Milwaukee's Lake Park (Couch Dec. ¶18)*

*The AR display in Texas Rope 'Em showing playing cards available at a game stop in the player's location (Couch Dec. ¶19)*

Texas Rope 'Em is currently in "1.0" or "beta" form, meaning that although it is publicly available, its functionality is limited compared to the anticipated full public release. *Id.* ¶22. As of the date of this Motion, the game is playable in select cities, including Milwaukee, *id.*, and is being actively showcased at technology events. *Id.* When the full version is released later this quarter, users will decide where game stops are populated. *Id.* ¶24.

## IV. <u>A Divided Board Adopts the Ordinance as a Knee-Jerk Reaction to Pokémon Go</u>

The unanticipated popularity of Pokémon Go in July 2016 encouraged thousands of users across the country to get outside and visit various public locations while playing the game.

One member of the Board—Sheldon Wasserman—says he received complaints that large numbers of people were playing the game in his district's Lake Park, some of whom littered or

stayed past park hours. Wasserman claimed that, as a result, "our county spent tens of thousands of dollars on law enforcement. Sheriff's deputies ... were put in parks, one park in particular. Going through parks at 10:00 at night chasing kids ... out of the parks .... We had parks crews ... going picking up litter.... All because of an event [called Pokémon Go.]" **Ex A** (Dec. 15, 2016 transcript). Wasserman's co-sponsor, Supervisor Sartori, added that "most people I believe – played this game responsibly, they were good visitors to our park, to our neighborhood, but there are always a few ... who want to throw garbage around." **Ex B** at 5 (Feb. 2, 2017 transcript).[2]

Wasserman reacted by proposing Resolution 16-637 (the "Ordinance," attached as **Ex D**) to regulate games like Pokémon Go by targeting the companies that publish them.[3] Multiple supervisors spoke against the Ordinance, disputing Wasserman's claims about the game's impact. *See*, *e.g*., Ex A at 4 (West: "the library, the American Legion post, and the Caterpillar Museum are all Pokémon Go spots. We have never had to call the police"); Ex B at 3 (Cullen: "I didn't think anything that drastic was happening. It looked like a bunch of young people ... using their free time to be active in the park."); *id*. (West: "It was great to see them running and being outside and being together and it was a very diverse group of people.... I didn't hear about rioting. I didn't hear about people not getting along with each other. And I didn't hear about additional sheriff's deputies being needed. I know that they were patrolling the parks just like they normally do.") One noted that "the Pokémon Go craze is pretty much over," Ex B at 3, while more than one perceived the true driving force behind residents' complaints to be

---

[2] Video of the Board deliberations are available at < http://milwaukeecounty.granicus.com/MediaPlayer.php?view_id=2&clip_id=1252> (Dec. 15, 2016) and < http://milwaukeecounty.granicus.com/MediaPlayer.php?view_id=2&clip_id= 1283&meta_id=294321> (Feb. 2, 2017). The attached transcripts are authenticated by **Ex C**.

[3] Ex B at 2 (Wasserman: "I really want to say this over and over. This is nothing to do against Pokémon players, absolutely not. And if you read through the ordinance that was written here, it's very clear this deals with a permitting process for a for-profit business.")

reactionary self-interest. *See*, *e.g.*, Ex B at 4 (West: "I think it was more of the way that the neighborhood and the community dealt with the fear of the unknown"); *id.* (West: "I don't think because you live across the street from a park that you should expect that you're never going to have people utilizing your park"); *id.* (Moore: "the communication that I received was eliminate these kinds of games from the park period... I'm not interested in legislating so that a group of people can have no one in their parks so that just the outside neighbors are using the parks.")[4]

There were two things that all of the Supervisors appeared to agree on. First was that Pokémon Go represented an entire genre of games that would only get more popular going forward.[5] The second was that the Ordinance was designed to make money for the County. *See* Ex B at 3 (Wasserman: "this company came in and made all the money off of our citizens. We had no recourse. We paid for it ourselves"); *id.* at 6 (Nicholson: "I think permitting a company to work within our parks is a great way to raise revenue"); *id.* at 7 (Moore: "I don't have a problem with large companies who make millions of dollars of games having to break us off a piece because they're using our parks").

## V.     The Vague and Overbroad Text of the Ordinance as Adopted

On February 2, 2017, the Board adopted the Ordinance by a vote of 13-4. On February 20, the Ordinance was published and became effective. The relevant text of the Ordinance reads:

(3) *Permits required for location-based augmented reality games*. Virtual and location-based augmented reality games are not permitted in Milwaukee County Parks except in those areas designated with a permit for such use by the Director of the Department of Parks, Recreation, and Culture. Permits shall be required

---

[4] *Cf.* Ex B at 4 (Sup. Sartori: "We don't know if [Niantic is] an American company or a company from Timbuktu.")

[5] *See* Ex A at 2 (Wasserman: "not just Pokémon, but future games [will] come to your district and to all of our districts"); Ex B at 2 (Wasserman: "This is just the start of the future reality of gaming. It's a new wave. It's coming."); *id.* at 3 (Cullen: "we have legislation before us that could potentially keep these kinds of games out of the parks"); *id.* at 4 (West: "I don't think ... after one particular incident that we should be legislating the whole future of reality games").

7

before any company may introduce a location-based augmented reality game into the Parks, effective January 1, 2017. The permitting application process is further described on DPRC's website for companies that create and promote such games. That process shall include an internal review by the DPRC to determine the appropriateness of the application based on site selection, protection of rare flora and fauna, personal safety, and the intensity of game activities on park lands. Game activity shall only occur during standard park hours, unless otherwise authorized by the DPRC Director, who has the authority to designate special events and activities within the Parks outside of the standard operational hours.

Ex D at 3. The resolution adopting the Ordinance (but not the codified language itself) defines "virtual gaming" as "an activity during which a person can experience being in a three-dimensional environment and interact with that environment during a game, and the game typically consists of an artificial world of images and sounds created by a computer that is affected by the actions of a person who is experiencing it; and ... [further provides that] Pokémon Go fits the characteristics defined by virtual gaming and is considered as such by the standards of the DPRC." (*Id.*) The Ordinance does not define what it means by the term "location-based augmented reality games," other than to repeatedly imply that Pokémon Go is such a game.

## VI.    __The Overbearing Permit Application Issued Pursuant to the Ordinance__

The DPRC website notes that the "Milwaukee County Parks 2017 Special Event Application" ("Permit Application") is required for "virtual gaming,"[6] although the website gives software publishers no guidance in finding the Permit Application or in understanding when it is needed. *See* Couch Dec. ¶¶31-33. This 10-page document requests a vast amount of information, such as estimated attendance, location in park, event dates and times, site map, whether and how the event will be advertised. *See id.* ¶34; **Ex E** (Permit Application). It requires detailed plans for garbage collection, on-site security, and medical services, and warns that applicants will be responsible for these services. Ex E at 5-9. The Permit Application requires

---

[6] The application can be found at <http://county.milwaukee.gov/ImageLibrary/Groups/cntyParks /permits/SpecialEventPermitApplication.pdf>.

applicants to have liability insurance and make it available on-site for inspection. Ex E at 2. It also requires payment of several fees, *see id.* at 1-3, 7, and reserves the limitless discretion to demand more:

> "[It] reserves the right to require additional information or documentation regarding the applicant, applicant's company, sponsoring company/organization, co-sponsors, event participants, event vendors, event activities or the event itself. Moreover, Milwaukee County Parks may postpone approval of event permit(s) until receipt of additional requested information or documentation. Failure to submit requested information or documentation in a timely manner may be cause for denial of a Special Event Permit." *Id.* at 2.

Even after all this, "**Submittal of an application does not automatically grant [an applicant] a permit or confirmation to conduct your planned event.**" *Id.* at 1 (emphasis in original).

## VII.  Penalties For Violating the Ordinance Include Fines and Imprisonment

The Ordinance does not exist in a vacuum. It was codified in Section 47 of the County Municipal Code, which regulates County "Parks and Parkways."[7] Section 47.29(1) specifies that the penalty for "violating any of the provisions of chapter 47... [is] a penalty of not less than ten dollars ($10.00) nor more than two hundred dollars ($200.00), together with the taxable costs in said action, in the discretion of the court, and in default of payment thereof, shall be imprisoned in the county jail or in the house of corrections of the county for a period not to exceed ninety (90) days, in the discretion of the court." In addition, the Ordinance also allows officers to arrest violators,[8] and empowers the DPRC to issue citations in addition to the other penalties above.[9]

---

[7]  See  <https://www.municode.com/library/wi/milwaukee_county/codes/code_of_ordinances?nodeId=MICOCOGEORVOI_CH47PAPA_SUBCHAPTER_IINGE_47.03GAAMPREXDEARPEEXUS>

[8] Section 47.30 provides: "Any peace officer of the county, or any of its municipal subdivisions, may without a warrant arrest any offender whom he/she may detect in the violation of any of the provisions of this chapter . . . and may use all necessary means to attain that end."

[9] Section 47.36(1) provides: "In addition to other applicable enforcement procedures, the director of the department of parks, recreation and culture may issue citations in accordance with section 63.09 of the Code [setting forth a citation procedure method and fee schedule] to any person who

**VIII.** **The Ordinance and Permit Application Apply to Texas Rope 'Em**

In late March 2017, Candy Lab AR's CEO Andrew Couch contacted the County to explain Texas Rope 'Em and confirm that Candy Lab AR "requires a Special Events permit before releasing its new location-based augmented reality game to the public." Couch Dec. ¶48. DPRC Special Events Coordinator Ryan Broderick responded by directing Couch: "you must complete the attached *Special Event Application* and submit with a *map* of all of the areas that you would like to add virtual gaming stops." *Id.* ¶49. Couch again responded to confirm that "Candy Lab AR requires a Special Events permit before releasing Texas Rope 'Em to the public." *Id.* ¶50. Broderick affirmed Couch's email. *Id.* ¶51.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show that (1) it will suffer irreparable harm in the period before final resolution of the claim; (2) there is no adequate remedy at law; (3) the claim has a reasonable likelihood of success on the merits; (4) the movant will be harmed more if the order does not issue than the opposing parties will be harmed if the order is granted; and (5) granting the injunction will not disserve the public's interest. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016); Fed. R. Civ. P. 65(a).

## ARGUMENT

**I.** **Candy Lab AR Will Suffer Irreparable Harm If an Injunction Is Not Issued**

    **a.** **Texas Rope 'Em, Like All Video Games and Entertainment Content, Is Speech Entitled to the Full Range of First Amendment Protections**

The Supreme Court has conclusively held that "video games qualify for First Amendment protection." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011). It explained:

---

violates any of the provisions of chapter 47 of the Code." Under Section 63.09, the fee schedule for violating section 47.03 is a maximum penalty of $500 with a $20 cash deposit.

The Free Speech Clause exists principally to protect discourse on public matters, but we have long recognized that **it is difficult to distinguish politics from entertainment, and dangerous to try.** Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine. Like the protected books, plays, and movies that preceded them, **video games communicate ideas—and even social messages—through many familiar literary devices** (such as characters, dialogue, plot, and music) **and through features distinctive to the medium (such as the player's interaction with the virtual world).** That suffices to confer First Amendment protection. Under our Constitution, esthetic and moral judgments about art and literature are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority.

*Id.* (citations, quotations, and ellipses omitted, emphasis added).[10] No court appears to have yet applied this holding specifically to video games with augmented reality or location-based features, but "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Id.* (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). As a video game designed to express and enable entertainment, Texas Rope 'Em is speech protected by the First Amendment.

### b. The Ordinance Purports to Regulate Texas Rope 'Em

Texas Rope 'Em fits the Ordinance's definition of "virtual gaming," because the AR display of poker cards that a player sees upon reaching designated coordinates is a "three-dimensional environment," and players "interact with that environment during the game." Couch Dec. ¶39. The game displays "an artificial world of images and sounds created by a computer [*i.e.*, by the mobile application] that is affected by the actions of person who is experiencing it." *Id.* And Texas Rope 'Em is a "location-based augmented reality game," at least as Candy Lab

---

[10] *See also Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562 (1977) ("There is no doubt that entertainment, as well as news, enjoys First Amendment protection"); *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) (reversing, on First Amendment grounds, refusal to preliminarily enjoin municipal ordinance restricting violent video games).

AR understands that term, in that it displays certain content based on the player's geolocation and displays some of that content in AR—to at least the same extent that Pokémon Go does. *Id.* Moreover, the DPRC confirmed that the Ordinance applies to Texas Rope 'Em through its correspondence with Mr. Couch in March 2017. *Id.* ¶¶47-51.

### c. The Ordinance Inflicts Irreparable Harm on Candy Lab AR By Interfering With Its First Amendment Right to Free Speech

The Supreme Court and the Seventh Circuit have long held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Citizens for a Better Env't v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975) (holding that even a "temporary deprivation" of First Amendment rights constitutes irreparable harm); *Hatchett v. Barland*, 816 F. Supp. 2d 583, 607 (E.D. Wis. 2011) (plaintiff "suffered the loss of his First Amendment freedoms to engage in political speech prior to obtaining a preliminary injunction from this Court, which is sufficient to establish irreparable harm."). Consequently, the Ordinance irreparably harms Candy Lab AR by improperly restricting its First Amendment rights.

The Ordinance also irreparably harms Candy Lab AR's business interests. As discussed above, the Ordinance requires Candy Lab AR to submit the Permit Application and receive a Special Event Permit before publishing a version of Texas Rope 'Em in Milwaukee County Parks. Candy Lab AR is a modestly sized startup company reliant on a handful of investors. Couch Dec. ¶44. It therefore cannot afford to undertake the process of researching the need to, let alone applying for, permits from municipal governments before publishing the very mobile applications that are the source of the company's revenue. *Id.* Nor can it afford to pay any permitting fees, much less the exorbitant fees contemplated by the Permit Application, to even one municipality, let alone all the others that will follow Milwaukee's example if the Ordinance

is upheld. *Id.*[11] The Ordinance has already caused Candy Lab AR and others to second-guess the extent that they will publish, or even endorse, location-based AR games. Couch Dec. ¶44; Inbar Dec. ¶55(e); Skwarek Dec. ¶26.

If Candy Lab AR is forced to comply with the harsh (and unconstitutional) requirements of the Ordinance, it will be entirely unable to publish an AR game capable of being played in Milwaukee County Parks. Couch Dec. ¶44.This, in turn, will deprive Candy Lab AR of the ability to engage in the creative use of the AR medium and further its business, as it desires to do. *Id.* Moreover, because Texas Rope 'Em has already been released to the public in beta form and is playable in County Parks, Candy Lab AR appears to already be in violation of the Ordinance and subject to potential enforcement action.

In short, these restrictions harm Candy Lab AR's business interests, but more importantly, the Ordinance both chills and actively impairs Candy Lab AR's right to free speech by entirely preventing Candy Lab AR from releasing its game and engaging in the creative use of the AR medium in County Parks. Accordingly, the first preliminary injunction factor— irreparable harm—strongly favors Candy Lab AR.

## II.      Traditional Legal Remedies Are Insufficient to Protect Candy Lab AR from Harm

In First Amendment cases, the "quantification of injury is difficult and damages are therefore not an adequate remedy." *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982). This is so because no amount of money can compensate Candy Lab AR for the deprivation of its constitutional rights. In this sense, "injunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages." *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990). Because "monetary damages cannot

---

[11] The same is true of most companies publishing AR content. *See* Inbar Dec. ¶67; Skwarek Dec. ¶25.

replace [even] the [temporary] loss of protected First Amendment rights," the second factor strongly favors Candy Lab AR. *Hatchett*, 816 F. Supp. 2d at 607.

### III.   Candy Lab AR Is Likely to Succeed on the Merits of its Claims

Since irreparable harm and the inadequacy of damages are generally presumed in First Amendment cases, "the likelihood of success on the merits will often be the determinative factor." *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004).[12] Defendants' adoption and enforcement of the Ordinance violates Candy Lab AR's First Amendment right to freedom of speech in at least three ways. The Ordinance is (1) a prior restraint that prohibits Candy Lab AR from publishing content without governmental permission; (2) so vague and ambiguous in its wording that it fails to give adequate notice of what is regulated; and (3) content-based discrimination that singles out "location-based augmented reality games" for harsher treatment than other mobile software. Candy Lab AR is likely to succeed on the merits of its First Amendment claim as to each of these arguments.

### A.   The Ordinance Restricts Speech Before It Occurs and Constitutes an Unconstitutional Prior Restraint

#### 1.   *The Ordinance Qualifies as a Prior Restraint*

A "prior restraint" is a rule that restricts expression before it takes place rather than imposing penalties on the expression after it occurs. *Alexander v. United States*, 509 U.S. 544 (1993). The elements of a prior restraint are: (1) a person seeking to exercise First Amendment rights is required to apply to the government for permission; (2) the government is empowered to determine whether the applicant should be granted permission on the basis of a review of the content of the proposed expression; (3) approval is dependent upon the government's affirmative

---

[12] *See also Wil-Kar*, 153 F. Supp. 2d at 994 ("Although in theory these elements are distinct, in the First Amendment context they essentially reduce to the question of whether plaintiff is likely to succeed on the merits.")

action; and (4) approval is not a routine matter, but involves an examination of the facts, an exercise of judgment, and the formation of an opinion. *Id.* at 554.

Here, the Ordinance imposes a permit requirement "*before* any company may introduce a location-based augmented reality game into the Parks." Ex D at 3 (emphasis added). Permits are granted by the DPRC, and the process involves an examination of facts—including the Permit Application—as determined by the DPRC. Moreover, the phrase "introduce into" (although nonsensical and vague if taken literally, as explained below), in the context of its surrounding language, of the Board's stated intent (both in the legislative history and the preamble to the Ordinance) to regulate games like Pokémon Go, and of the DPRC's direct email confirmation, can only mean to publish or release the software to the public that is capable of being played in County parks. Couch Dec. ¶30.

Put differently, the DPRC determines whether an applicant is allowed to publish AR games that are playable in County parks—*i.e.* engage in speech—*before* such speech may occur. Thus, the Ordinance's permitting requirement is properly characterized as a prior restraint.

### 2.     *Prior Restraints Are Presumed Unlawful and Nearly Impossible to Justify*

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), and are "presumptively unconstitutional." *Id*. at 558. For instance, in *New York Times v. United States*, 403 U.S. 713, 714 (1971), the government sought to enjoin the publication of excerpts from a classified study of the United States' involvement in Vietnam. Despite the fact that a majority of the Court believed the release of these "Pentagon Papers" would be harmful to the nation as a whole, the Court recognized that "[o]pen debate and discussion of public issues are vital to our national health," and thus held that the government had not carried its "heavy burden of showing justification for the imposition of such a restraint." *Id.* at 714, 724.

15

If concerns of national security cannot even satisfy the heavy presumption against prior restraints, Defendants certainly cannot justify this prior restraint. The Board stated its purpose for adopting the Ordinance as follows:

> WHEREAS, although Pokémon Go has significantly increased the public's recreational usage of Milwaukee County Parks, the sudden mass influx of Pokémon Go players in Lake Park in particular since July 6, 2016 has resulted in unanticipated consequences, including, but not limited to, <u>increased litter</u> and waste in the park, <u>inadequate bathrooms</u> to accommodate the high ratio of people, <u>after-hours violations, enhanced security oversight, unauthorized vendors, significant daily traffic congestion, parking violations, trampled grass,</u> and related concerns about <u>sensitive flora and fauna areas.</u>

Ex D at 1 (emphasis added); *see also* Exs A & B (discussing, as described *infra*, isolated incidents of littering, alleged increases in police presence, and less noble purposes such as provincial prejudices against gamers and a desire to get "a piece" of Niantic's profits). Even viewed in the most favorable light, the County's best justification for the Ordinance is to help pay for doing a little more of what it does already: policing the public's use of public parks.

But restricting the First Amendment rights of game publishers is not a proper or permissible way to address concerns about a handful of rule-breakers. It would be an absurd result to allow a government to prohibit Candy Lab AR from engaging in its fundamental right to publish speech simply because some of those who receive the speech might trample the daisies while doing so, when even a credible threat to the lives of American servicemen and intelligence officers could not persuade the Supreme Court to enjoin the *New York Times* and *Washington Post* from publishing the Pentagon Papers. *See New York Times*, 403 U.S. at 724.

### 3. *The Ordinance's Permitting Scheme Fails Prior Restraint Analysis*

This Court has identified two particular situations that render permitting schemes unconstitutional under a prior restraint analysis: when (1) the scheme places "unbridled discretion in the hands of a government official or agency," or (2) the scheme does not limit the

time within which the decision-maker must issue a license or permit. *Special Souvenirs, Inc. v. Town of Wayne*, 56 F. Supp. 2d 1062, 1085 (E.D.Wis.1999) (quoting *City of Lakewood v. Plain Dealer Pub., Co.*, 486 U.S. 750, 757 (1988). Both situations are present here.

        a.     <u>The Ordinance Places Unbridled Discretion in the County's Hands.</u>

First, the Ordinance places unbridled discretion in the hands of the decision-maker—the DPRC. The Supreme Court has long held that "subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). In *Shuttlesworth*, the ordinance at issue made it unlawful to organize or hold a parade or demonstration in the city streets without a permit. *Id.* at 149. Individuals were required to submit a written application to obtain a permit that included information such as "the probable number of persons, vehicles and animals which will be engaged in such parade, procession or other public demonstration, the purpose for which it is to be held or had, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or other public demonstration." *Id.* at 149. The ordinance required the commission to grant the permit unless the commission "in its judgment" believed a permit should be refused. *Id.*

The Court struck down the ordinance, holding that the ordinance impaired expressive conduct protected by the First Amendment. *Id.* at 152. Although the city had a right to regulate streets and parks to maintain order, this right was not absolute. *Id.* To the contrary, the Court held that "[e]ven when the use of its public streets and sidewalks is involved, ... a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question." *Id.* at 153.

The Ordinance here is materially indistinguishable from the one struck down in *Shuttlesworth*. Under its terms, a game developer must submit the Permit Application *before* introducing an AR game in County Parks. The Ordinance states that the permit process "shall include an internal review by the DPRC to determine the appropriateness of the application based on site selection, protection of rare flora and fauna, personal safety, and the intensity of game activities on park lands." Ex D at 3. The Ordinance further directs game developers to visit the DPRC's website to learn more about the permitting application process. *Id.* Though the Ordinance lists considerations for the DPRC—site selection, protection of rare flora and fauna, personal safety, and the intensity of game activities—it imposes no standards regarding the consideration of these factors. Instead, like the ordinance in *Shuttlesworth*, the Ordinance merely requires the DPRC to, in its discretion, "determine the appropriateness" of the application. *Id.*

The Permit Application also fails to contain standards that would limit the decision-maker's discretion. Although the Permit Application requests a vast amount of information—such as estimated attendance, location in park, event dates and times, site map, whether and how the event will be advertised, plans for garbage collection, and provisions for on-site security and medical services (much of which is not applicable to mobile applications)—nothing in the Permit Application suggests that providing this information will result in the application being granted.[13] To the contrary, the Permit Application specifically warns that "**Submittal of an application does not automatically grant you a permit or confirmation to conduct your planned event.**" Ex D at 1. This means that Candy Lab AR (or any other game developer) could complete the entire, laborious permitting process—including by paying non-refundable fees,

---

[13] *Cf. Cox v. New Hampshire*, 312 U.S. 569, 575-76 (1941) (upholding an ordinance that required the issuance of a permit to anybody who applied, subject only to the power of the licensing authority to specify the "time, place and manner" of the parade in order to accommodate competing demands for public use of the streets).

securing insurance coverage, submitting all of its game content and advertising for review, among other things—and still be denied a permit on the DPRC's whim. This type of unbridled discretion is precisely what the First Amendment prior restraint analysis is designed to avoid. *See Little*, 575 F. Supp. at 662 (declaring unconstitutional an ordinance that required a party to obtain a special use permit that was subject to final approval of the Common Council and that specified no standards to guide the Council's decision). Because the Ordinance grants the County virtually unbridled power to decide whether or not to issue a permit, Candy Lab AR is likely to succeed on its argument that the Ordinance is an unconstitutional prior restraint.

b.    The DPRC's Discretion Is Not Time-Limited

The Permit Application notes that "[a]fter receipt of your application, you will be notified via email within two (2) weeks regarding the status of your application." Ex D at 1. This is the only instance in which the Permit Application provides any discussion of timing. There are no standards dictating the timeframe in which a Permit Application must be granted or denied.

Instead, in the Permit Application, the County "reserves the right to require [an unlimited amount of] additional information or documentation." *Id.* at 2. This failure to include reasonable timing restrictions violates the First Amendment. *See Special Souvenirs*, 56 F. Supp. at 1089 ("Because it lacks reasonable and specific decisonmaking time limits, the Town's conditional use permit scheme is unconstitutional as applied to businesses engaged in First Amendment activity."). Therefore, Candy Lab AR is also likely to succeed on the merits of this argument.

**B.    The Ordinance Fails to Give Adequate Notice of the Speech It Proscribes and Is Thus Unconstitutionally Vague**

*1.    Vagueness Challenges Apply in Cases Involving First Amendment Rights*

In the First Amendment arena, "government may regulate ... only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). A vagueness claim alleges that, as

19

written, the law either fails to provide definite notice to individuals regarding what behavior is regulated or invites arbitrary and discriminatory enforcement, or both. *See Skilling v. United States*, 561 U.S. 358 (2010). To satisfy due process, a statute must be stated (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement. *Id.* This general test of vagueness applies with particular force in review of laws dealing with speech. "[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Smith v. California*, 361 U.S. 147, 151 (1959).

In vagueness cases arising under the First Amendment, courts are "concerned with the vagueness of the statute 'on its face' because such vagueness may in itself deter constitutionally protected and socially desirable conduct." *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 36 (1963). This is because "where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (citations omitted). As such, Candy Lab AR may facially challenge the vagueness of the Ordinance pursuant to the First Amendment.

### 2. The Ordinance Is Unconstitutionally Vague and Overbroad

On its face, the text of the Ordinance is incredibly vague, to the point where it is practically impossible for game developers to discern what type of conduct the Ordinance allows and what it regulates. The Supreme Court has held ordinances to be unconstitutionally vague when they can be construed to permit punishing persons for merely expressing unpopular views, *Cox v. Louisiana*, 379 U.S. 536 (1965), or when enforcement of the ordinance depended on the

completely subjective standard of "annoyance." *Coates v. Cincinnati*, 402 U.S. 611 (1971). The Court has also noted that, "in numerous other cases, we have condemned [as vague] broadly worded licensing ordinances which grant such standardless discretion to public officials that they are free to censor ideas and enforce their own personal preferences." *Grayned*, 408 U.S. at 113 n.22 (citing *Shuttlesworth*, 394 U.S. at 147).[14] The Ordinance suffers from all of these defects.

a.     The Ordinance Fails to Define When a Game Is "Introduced"

The most obviously defective portion of the Ordinance is the phrase "before any company may *introduce* a location-based augmented reality game *into* the Parks." Ex D at 3. Game developers do not "introduce" software "into" any physical location, even if the game is designed to be played in particular places. Couch Dec. ¶30(d)(i). Rather, developers *publish* the game in app stores for users to download. *Id.* Even if certain content is designed to react to, or displayed in, a particular geolocation, it does not actually exist *in* that location. It is merely displayed on a mobile device screen. *Id.* Consequently, it is unclear whether the Ordinance applies when the game is released into an app store, or when a user actually plays it in County Parks, or at some other undefined time. This not only fails to provide notice to game developers of what conduct is regulated, but it also invites arbitrary enforcement.

b.     The Ordinance Fails to Define Which "Games" Are Regulated

i.     *"Virtual Gaming"*

The Ordinance's preamble and the Permit Application define "virtual gaming" as "an activity during which a person can experience being in a three-dimensional environment and interact with that environment during a game." Ex D at 2. This language is irrelevant to the

---

[14] *See also Staub v. City of Baxley*, 355 U.S. 313 (1958); *Saia v. New York*, 334 U.S. 558 (1948); *Schneider v. State*, 308 U.S. 147, 163-64 (1939); *Lovell v. Griffin*, 303 U.S. 444 (1938); *Hague v. CIO*, 307 U.S. 496 (1939).

public's understanding of the Ordinance, since it is not contained within the codified text. But even if it does apply, taken literally, it could describe *any* physical game in which any person can engage, such as baseball, hopscotch, tag, or even swinging on park swings. Couch Dec. ¶30(a). The Ordinance preamble further explains that a virtual game "typically consists of an artificial world of images and sounds created by a computer that is affected by the actions of a person who is experiencing it." Ex D at 2. But the word "typically" indicates that this description is not a necessary part of the definition. Running down a sidewalk while wearing an activity tracker such as a Fitbit bracelet or Apple Watch can cause those devices to emit both images and sounds. Couch Decl. ¶30(a). Similarly, two children playing with battery-powered *Star Wars* lightsabers also experience a three-dimensional environment accompanied by artificial images and sounds. *Id.* Both of these activities *literally* fit the Ordinance's definition of "virtual gaming," but fall outside its apparent intent. It is impossible to determine whether this conduct is regulated.

ii.    *AR "Games"*

The Ordinance singles out AR "games." As another court in this Circuit held in enjoining a similar ordinance prohibiting "games" in "public places" without a permit,

> The term "game" is exceedingly vexed and difficult, as the philosopher Ludwig Wittgenstein explained in a famous passage:
>
>> Consider for example the Proceedings that we call "games.". I mean board-games, card-games, ball-games, Olympic games, and so on. What is common to them all? --Don't say: "There must be something common, or they would not be called 'games'" --but look and see whether there is anything common to all. --For if you look at them you will not see something that is common to all, but similarities, relationships, and a whole series of them at that. To repeat: don't think, but look!--Look for example at board-games, with their multifarious relationships. Now pass to card-games; here you find many correspondences with the first group, but many common features drop out, and others appear. When we pass next to ballgames, much that is common is retained, but much is lost.-- Are they all "amusing"? Compare chess with noughts and crosses

[tic tac toe]. Or is there always winning and losing, or competition between players? Think of patience. In ball games there is winning and losing; but when a child throws his ball at the wall and catches it again, this feature has disappeared. Look at the parts played by skill and luck; and at the difference between skill in chess and skill in tennis. Think now of games like ring-a-ring-a-roses; here is the element of amusement, but how many other characteristic features have disappeared! And we can go through the many, many other groups of games in the same way; can see how similarities crop up and disappear. And the result of this examination is: we see a complicated network of similarities overlapping and criss-crossing: sometimes overall similarities, sometimes similarities in detail.

Ludwig Wittgenstein, *Philosophical Investigations* §§ 66-67, at 31-32 (G.E.M. Anscombe trans., Macmillan Publishing Co. 3d ed. 1958). (For further discussion of the concept of a game, multiplying complications, see Bernard Suits, *The Grasshopper: Games, Life, and Utopia* (1978).)

Because the term "game" is not defined or otherwise restricted in the ordinance, the law "'fails to articulate with any specificity the conduct to be proscribed, . . . [and so] might not provide fair warning,'" *Wiemerslage v. Maine Twp. High Sch. Dist. 207, 29 F.3d 1149, 1151 (7th Cir. 1994)* (*quoting Grayned v. City of Rockford, 408 U.S. 104... (1972))*. It risks "'conferring on law enforcement and judicial officers an inordinate amount of discretion which easily translates into arbitrary or even discriminatory application.'" *Id.* Is bicycling a game? Juggling? What about Pokémon? Suppose I am trading Pokémon cards but not trying to beat the other Player? And so forth. The citizens of Tinley Park do not know what is prohibited.

*Weigand v. Village of Tinley Park*, 114 F. Supp. 2d 734, 738 (N.D. Ill. 2000) (granting preliminary injunction); *converted to permanent injunction*, 129 F. Supp. 2d 1170, 1171 (2001) ("it is hopelessly vague and substantially overbroad, because there is no attempt to explain what is meant by 'game'"). The term "location-based augmented reality games" is no more specific, for this merely indicates the medium and one feature the games must share, but gives no guidance on what a "game" is. This Ordinance is just as defective as that in *Weigand*.

c.     The Ordinance Does Not Define "Location-Based"

Although each of Candy Lab AR's declarants has an understanding of what they believe "location-based" to mean in this context, no one has any way of knowing what Defendants mean

by it. Specifically as used in the phrase "location-based AR games," the term "'location-based' could mean any of the following: ... Content that is fixed to, and only accessible at, predetermined geographic coordinates, like the game stops ...[;] Content that is triggered by physical objects regardless of where they are located ...[;] Content that is dynamically triggered based on the user's proximity to objects that are not fixed in space, such as another person's mobile device[;] Content that is dynamically assigned to specific geographic locations randomly chosen by an algorithm...[;] [or] Content that is assigned to a particular geographic location by a player...." Inbar Dec. ¶55(b)(i). Inbar gives examples of AR games fitting each description. "In a manner of speaking, [moreover], *any* AR display—whether meant for gaming or any other purpose—is 'location-based,' and has some relationship to the user's physical location, because AR displays by their very nature are meant to be blended with the user's view of their physical surroundings." *Id.* ¶35. Thus, the term is hopelessly vague as used in the Ordinance.

### d. The Ordinance Fails to Sufficiently Define "Augmented Reality"

The term "augmented reality" is also subject to multiple interpretations. Many would argue that even the example of AR provided in the Ordinance—Pokémon Go—is not really an "augmented reality" game, since the AR component of the game is not essential to the gameplay and can be deactivated. Couch Dec. ¶30(b)(iii); Inbar Dec. ¶¶40-41. Further, "augmented reality" also describes the enhancement of senses other than the sense of sight—*i.e.* the senses of hearing, touch, taste, and smell, which are also means by which people perceive reality. Inbar Dec. ¶¶45-49. The Ordinance says nothing about whether and how it applies to these applications.

Candy Lab AR's declarants explain at more length these defects and how they threaten the entire AR industry. *See* Couch Decl. ¶¶30-46; Inbar Decl. ¶¶55-73; Skwarek Dec. ¶¶23-31. Because the conduct regulated in the Ordinance is not stated with sufficient definiteness that ordinary people can understand what conduct is prohibited, and because the ambiguities in the

Ordinance encourage arbitrary and discriminatory enforcement—particularly given that neither the Ordinance nor the Permit Application include any standards to guard against such enforcement—the Ordinance is unconstitutionally vague.

## C.  The Ordinance Discriminates Based on Content

Content-based regulations are presumptively invalid under the First Amendment. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992). The Supreme Court recently examined the specific parameters of content-based restrictions in *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015). There, a comprehensive code prohibited the display of outdoor signs without a permit. The code exempted 23 categories of signs, including "Ideological Signs," "Political Signs," and "Temporal Directional Signs." *Id.* at 2224-25. Petitioners, whose Sunday church services were held at various locations in the town, posted signs bearing the church name and the time and location of the next service, and was cited for exceeding the time limits for displaying temporary directional signs and for failing to include an event date on the signs. *Id.* at 2225. The district and circuit courts refused to enjoin the ordinance, reasoning that it did "not mention any idea or viewpoint, let alone single one out for differential treatment." *Reed v. Town of Gilbert*, 707 F.3d 1057, 1077 (9th Cir. 2013).

The Supreme Court reversed, holding that even if the town's regulation was not based on disagreement with the message conveyed on the signs, it defined the categories of "temporary," "political," and "ideological" signs on the basis of their messages and then subjected each category to different restrictions. 135 S. Ct. at 2227. Thus, the restrictions were content-based on their face because they depended "entirely on the communicative content of the sign." *Id.* This was true regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained on each of the specific signs. *Id.*

Case 2:17-cv-00569-JPS   Filed 04/21/17   Page 34 of 39   Document 6

Defendants' Ordinance singles out specific categories of mobile software—"virtual or location-based augmented reality games"—for more restrictive treatment than other mobile software, other games, other video games, and even other location-based or AR content. Even under pre-*Reed* law, this is unlawful, content-based discrimination. *See Weigand*, 114 F. Supp. 2d at 737 ("the regulation might plausibly be argued to be content-based, not content-neutral, insofar as playing a game could be the content of the expressive activity.").

### D. The Ordinance Fails Strict Scrutiny

Impairments of fundamental rights such as those protected by the First Amendment "implicate strict scrutiny, not a rational basis review, and so the regulation would be upheld only if it were narrowly tailored to serve a compelling government interest." *Weigand*, 114 F. Supp. 2d at 737 (citing *Gillespie v. City of Indianapolis*, 185 F.3d 693, 708 (7th Cir. 1999)).

#### 1. *The Ordinance Serves No Compelling Interest*

Interests that the Supreme Court has recognized as "compelling" have been those that are fundamental to the ability of a free society to function. *See*, *e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 345 (1972) (election fraud); *Haig v. Agee*, 453 U.S. 280, 307 (1981) (national security); *Lefkowitz v. Cunningham*, 433 U.S. 72, 109 (1977) (Brennan, J., dissenting) (public corruption). By contrast, the Court has struck down interests that it deemed "valid" but not "compelling," such as maintaining a stable, racially integrated neighborhood and minimizing the visual clutter associated with signs. *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85 (1977); *City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994); *cf. Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984) (noting only that the government has a *substantial interest* "in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence").

Defendants' interests in enacting the Ordinance do not rise to the level of "compelling." Preventing a significant number of visitors from entering the park is certainly not a compelling state interest, as a park is axiomatically a public forum in which people can gather to disseminate ideas. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) ("This Court long ago recognized that members of the public retain strong free speech rights when they venture into public streets and parks, "which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' "(quoting *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983))). The same is true of preventing litter and after-hours violations—what Supervisor Sartori characterized as "a few [kids] ... who want to throw garbage around." Ex B at 5. While these interests may indeed be legitimate in the abstract, they cannot be classified as compelling. They are more akin to the government's stated interest of minimizing clutter in *Ladue*, which the Court addressed as "concededly valid" but "certainly no more compelling" than other interests that the Court had previously found to be insufficient. 512 U.S. at 54. None of the County's stated reasons for the Ordinance rise to the level of compelling.

2.    *The Ordinance Is Not Narrowly Tailored to Achieve These Interests*

Even if these interests could be considered compelling, the Ordinance is not narrowly tailored to achieve them. A restriction is narrowly tailored only if there are no less restrictive alternatives available. *Boos v. Barry*, 485 U.S. 312, 329 (1988). Stated differently, the narrow tailoring requirement ensures that the government cannot "burn the house to roast the pig." *See Butler v. Michigan,* 352 U.S. 380, 383 (1957). "To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). The government bears the burden

27

of showing that a less restrictive alternative would not be as effective as the chosen method. *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006).

For instance, in *Entertainment Software Association*, video industry trade associations challenged an Illinois law restricting sales and rentals to minors of sexually explicit video games. Even though the court agreed that protecting children from indecent sexual material was a compelling interest, the blanket restrictions were not narrowly tailored. Specifically, the state could have merely passed legislation that increased awareness among parents of the ratings system. *Id.* at 650.

Here, as in *Entertainment Software Association*, the County could have taken numerous other approaches that would have been less restrictive (and, likely, more effective) at achieving these goals. Rather than entirely prohibiting game developers from introducing their games in the County just to avoid the possibility that a handful of players would violate park rules, Defendant could have merely continued doing what it was already doing—and what *every other municipality in the country* has done in response to the sudden influx of gamers—which is to enforce the existing park rules against those who violate them. Supervisor Cullen listed a number of less-restrictive alternatives in the course of unsuccessfully opposing the Ordinance:

> I understand that there are concerns with trash in bathrooms, but that's our job to address. We could have done many things to capitalize on this phenomenon. <u>We could have roped off areas and charged a small fee for access. We could have had undercover officers writing a huge number of tickets and collected on that revenue. We could have brought in the beer garden.</u> Instead, we have legislation before us that could potentially keep these kinds of games out of the parks and that scares me.

Ex B at 3. Such approaches are aimed at achieving the same goals—protecting the condition of the park—without stifling speech or singling out a particular category of expression (or

expressive activity). They also address the rule-breakers directly, rather than hoping that the prohibition of speech has a downstream effect on individual behavior.

Instead, the Ordinance is under-inclusive because it fails to regulate any other type of mobile activity that may someday be as popular as Pokémon Go, or more distracting. And it is over-inclusive because it can be construed as applying to all manner of speech that is even closer to the core of the First Amendment, such as art and political speech. *See Weigand*, 114 F. Supp. 2d at 737 ("The ordinance clearly sweeps in much protected conduct. A game might be part of a political protest, to take the clearest case...."); Skwarek Dec. ¶¶7-16 (describing political speech in AR); *see also* Inbar Dec. ¶55(b)(iii) (could include consumer review and navigation apps).

Candy Lab AR has alleged three independent ways in which the Ordinance is invalid under the First Amendment—it is a prior restraint, it is unconstitutionally vague, and it is a content-based restriction. It cannot survive strict scrutiny on any of these bases. Candy Lab AR is reasonably likely to succeed on each of these arguments. As such, the third factor for issuing a preliminary injunction also weighs in favor of Candy Lab AR.

## IV.    Both the Balance of Harms and Public Interest Weigh in Favor of an Injunction

It is axiomatic that if the moving party establishes a likelihood of success on the merits on a First Amendment claim, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is likely unconstitutional. *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012). Stated differently, "injunctions protecting First Amendment freedoms are always in the public interest." *Id.*

Similarly, there can be no irreparable harm to a local government when it is prevented from enforcing an unconstitutional statute because "'it is always in the public interest to protect

First Amendment liberties.'" *Joelner*, 378 F.3d at 620 (citation omitted). Indeed, the Supreme Court has repeatedly stated that public discourse should be "uninhibited, robust, and wide-open." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964)). Accordingly, a preliminary injunction would not harm Defendants but would greatly serve the public interest by providing a valuable opportunity for Candy Lab AR (and other game developers) to engage in such speech without hesitation or restraint.

## CONCLUSION

For all of the foregoing reasons, Candy Lab AR respectfully requests that this Court enter an order preliminarily enjoining Defendants and their employees, agents, and representatives, and all persons in active concert or participation with any of them from enforcing the Ordinance.

WARNER NORCROSS & JUDD LLP

Dated: April 21, 2017

By: /s/ Brian D. Wassom
Brian D. Wassom
Conor B. Dugan (*admission pending*)
Ashley G. Chrysler (*admission pending*)
2000 Town Center, Suite 2700
Southfield, Michigan 48075
248.784.5039
bwassom@wnj.com
conor.dugan@wnj.com
achrysler@wnj.com

*Attorneys for Plaintiff Candy Lab AR, Inc.*

15697283-5