UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

CANDY LAB, INC.,
a Nevada Corporation,

        Plaintiff,

    v.

MILWAUKEE COUNTY, a municipal
corporation; MILWAUKEE COUNTY
BOARD OF SUPERVISORS; and
MILWAUKEE COUNTY DEPARTMENT
OF PARKS, RECREATION, AND
CULTURE,

        Defendants.

**Case No. 17-CV-00569-JPS**

---

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

I.      The Pokémon Go problems and Milwaukee County's need to respond. ........................... 3

II.     Candy Lab's new augmented reality game. ............................................................. 4

STANDARD OF REVIEW ..................................................................................... 6

ARGUMENT ....................................................................................................... 6

I.      Candy Lab is not likely to succeed on the merits of its claims. ..................................... 6

        A.      Candy Lab has no cognizable claim because Texas Rope 'Em is not
                protected speech under the First Amendment. ............................................... 6

                1.      Texas Rope 'Em is not protected speech because it does not
                        convey any messages or ideas. ...................................................... 6

                2.      Texas Rope 'Em qualifies as illegal gambling. ................................ 10

        B.      Even if Texas Rope 'Em is protected speech, Candy Lab's constitutional
                arguments still fail. ............................................................................... 12

                1.      This case does not involve a prior restraint. .................................... 12

                2.      The Ordinance is not vague. ....................................................... 14

                3.      The Ordinance is not a content based restriction. ............................. 17

                4.      The strict scrutiny analysis does not apply but even if it did, the
                        Ordinance would survive. ........................................................... 18

II.     Candy Lab will not suffer irreparable harm if an injunction is not issued. ...................... 20

III.    Candy Lab has traditional remedies at law. ........................................................... 22

IV.     The balance of harms and public interest weigh in favor of denying the injunction
        because granting the injunction would disserve the public interest. .............................. 22

CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Am. Amusement Mach. Ass'n v. Kendrick*,
    244 F.3d 572 (7th Cir. 2001) ................................................................................... 8

*Am. Civil Liberties Union of Illinois v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) ............................................................................. 2, 3

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786 (2011) ......................................................................................... 7, 8

*City of Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41 (1986) .............................................................................................. 18

*City of Watseka v. Ill. Pub. Action Council*,
    796 F.2d 1547 (7th Cir. 1986), *aff'd*, 479 U.S. 1048 (1987) ........................... 18, 20

*Clark v. Community for Creative Nonviolence*,
    468 U.S. 288 (1984) ........................................................................................... 20

*Cox v. New Hampshire*,
    312 U.S. 569 (1941) ........................................................................................... 13

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................................... 21

*Hill v. Colorado*,
    530 U.S. 703 (2000) ..................................................................................... 15, 17

*Joelner v. Vill. of Wash. Park, Ill.*,
    378 F.3d 613 (7th Cir. 2004) ............................................................................. 23

*Jones v. Markiewicz-Qualkinbush*,
    842 F.3d 1053 (7th Cir. 2016) ........................................................................... 23

*Lederman v. N.Y. City Dep't of Parks & Recreation*,
    901 F. Supp. 2d 464 (S.D.N.Y. 2012), *aff'd*, 731 F.3d 199 (2d Cir. 2013) ............ 19

*Machlett Labs., Inc. v. Techny Indus., Inc.*,
    665 F.2d 795 (7th Cir. 1981) .......................................................................... 6, 23

*Nat'l Council of Arab Americans, Act Now to Stop War & End Racism Coal. v. City of N.Y.*,
    478 F. Supp. 2d 480 (S.D.N.Y. 2007) ................................................................ 19

*Reed v. Town of Gilbert, Ariz.*,
    135 S. Ct. 2218 (2015) ................................................................................. 17, 18

*Sampson v. Murray*,
    415 U.S. 61 (1974) .............................................................................................. 22

*Samuelson v. LaPorte Cmty. Sch. Corp.*,
    526 F.3d 1046 (7th Cir. 2008) ........................................................................... 12

MIL-28556289-1 810229/545

*Se. Promotions, Ltd. v. Conrad,*
420 U.S. 546 (1975) ........................................................................................... 7

*Signode Corp. v. Weld-Loc Sys., Inc.,*
700 F.2d 1108 (7th Cir. 1983) ......................................................................... 22

*Spence v. State of Washington,*
418 U.S. 405 (1974) ........................................................................................... 8

*Telesweeps of Butler Valley, Inc. v. Kelly,*
No. 3:12-CV-1374, 2012 WL 4839010 (M.D. Pa. Oct. 10, 2012) ......................... 8

*There to Care, Inc. v. Comm'r of Indiana Dep't of Revenue,*
19 F.3d 1165 (7th Cir. 1994) ......................................................................... 8, 11

*Thomas v. Chicago Park Dist.,*
534 U.S. 316 (2002) ................................................................................... 13, 14

*United States v. O'Brien,*
391 U.S. 367 (1968) ........................................................................................... 7

*United States v. Playboy Entm't Grp., Inc.,*
529 U.S. 803 (2000) ......................................................................................... 18

*United States v. Raines,*
362 U.S. 17 (1960) ........................................................................................... 15

*Vogel v. American Soc. of Appraisers,*
744 F.2d 598 (7th Cir.1984) ........................................................................... 21

*Warden v. Nickels,*
697 F. Supp. 2d 1221 (W.D. Wash. 2010) ....................................................... 19

*Weigand v. Vill. of Tinley Park,*
114 F. Supp. 2d 734 (N.D. Ill. 2000) ............................................................... 16

*Zacchini v. Scripps-Howard Broad. Co.,*
433 U.S. 562 (1977) ........................................................................................... 7

**Statutory Authorities**

Wis. Stat. § 945.01(5) ....................................................................................... 11

## **INTRODUCTION**

Plaintiff, Candy Lab, Inc. ("Candy Lab"), is a California corporation and its CEO a California resident. Candy Lab makes money by selling augmented reality games and other mobile software to gamers around the country. It is far from the only company that develops games using augmented reality, which is a technology that superimposes computer-generated images on a user's perception of physical reality. Last year, a company called Niantic, Inc. released Pokémon Go, which became a global phenomenon. Gamers around the world flooded public spaces to capture Pokémon creatures and earn points. Milwaukee County's parks, and in particular Lake Park, were prime stomping grounds for the frenzy.

Milwaukee County's parks are state jewels, treasured and enjoyed by thousands of residents and visitors each year. Milwaukee County is charged with preserving the natural elements of the park, protecting the parks' visitors, and maintaining a clean environment. But its ability to do that was impeded last year when Lake Park, and many others, were inundated with thousands of unexpected visitors playing Pokémon Go in a short period of time. What followed was not surprising: increased trash and waste, increased altercations and citations, increased parking violations, increased patrol officers and increased noise and disturbance. All of that naturally led to increased costs, which the County and its taxpayers had to absorb.

Milwaukee County had to respond, appreciating the enthusiasm of new park visitors but knowing it needed to exercise some control over the use of its parks by for-profit companies, the scale of which is unlimited. Defendants, Milwaukee County, the Milwaukee County Board of Supervisors and the Milwaukee County Department of Parks, Recreation and Culture (together, "Milwaukee County"), enacted Section 47.03 of the Milwaukee County Code of Ordinances, which requires companies introducing location-based augmented reality games in Milwaukee County parks

to first obtain a permit (the "Ordinance"). Candy Lab filed the instant lawsuit shortly thereafter, claiming that the Ordinance violates its First Amendment rights with respect to its new augmented reality game – Texas Rope 'Em. Apparently, Candy Lab thinks that Milwaukee County and its taxpayers should subsidize its for-profit enterprise. But its legal maneuver is flawed and its Motion for a Preliminary Injunction should be denied.

First, and most importantly, Candy Lab cannot obtain a preliminary injunction when it has not stated a claim upon which relief can be granted. *See Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (on a motion for preliminary injunction, the analysis is first, whether the complaint states a claim for a First Amendment violation, and second, whether that claim is likely to succeed). Candy Lab has failed to state a cognizable claim for a First Amendment violation because Texas Rope 'Em is <u>not</u> protected speech. (*See also* Milwaukee County's Motion to Dismiss). Texas Rope 'Em does not convey any messages or ideas, but rather is a simulated gambling game which is not entitled to First Amendment protection (and which is also illegal). Without First Amendment protection, Candy Lab has no First Amendment claims upon which relief can be granted.

Second, Candy Lab's constitutional arguments fail because the Ordinance is not vague but rather is a permissible content-neutral time, place and manner restriction. Third, Candy Lab is not at risk of irreparable harm because Texas Rope 'Em is not available to play in Milwaukee County, meaning there is no injury. Also, even if Candy Lab had an injury, whatever damages it could suffer can be remedied monetarily at the conclusion of this case (*e.g.* lost profits). Finally, Milwaukee County's need to preserve the integrity of its parks greatly outweighs Candy Lab's bottom line.

Denying the injunction will better serve the public interest of Milwaukee County and its residents. Candy Lab's Motion should be denied.[1]

**STATEMENT OF FACTS**

**I.      The Pokémon Go problems and Milwaukee County's need to respond.**

On July 6, 2016, Niantic released Pokémon Go, a location-based augmented reality game which immediately gained worldwide popularity. (Declaration of Andrew Couch ("Couch Decl."), ¶ 25, Ordinance, p. 1.) Players flooded public spaces to "catch" and "train" virtual Pokémon characters at designated stationed markers known as "Poke stops." (*Id.*) Pokémon Go brought thousands of additional people to Milwaukee County parks in just a few short months. (*Id.*)

In particular, Milwaukee County's Lake Park was one of the most highly trafficked spaces for Pokémon Go players due to the numerous historic landmarks within Lake Park that were designated Poke stops. (*Id.*) The sudden mass influx of Pokémon Go players in Lake Park had several consequences, including, but not limited to: increased litter and waste, inadequate bathrooms, after-hours violations, enhanced security, unauthorized vendors, significant traffic congestion, parking violations, trampled grass and potential damage to surrounding flora and fauna. (*Id.*) For example, additional law enforcement had to be removed from the highways and stationed at Lake Park, juveniles were found in the park after-hours and in areas with potentially dangerous conditions, such as water hazards and drop-offs, additional crews had to be deployed to clean up the extra trash and waste, including prisoners from a correctional facility, to name a few. (Motion, Ex. A, December 15, 2016 Transcript.) All of that extra activity led to additional costs and burden on Milwaukee County and its taxpayers. (*Id.*)

---

[1]     Even if this Court decided to grant the preliminary injunction enjoining Milwaukee County from enforcing the Ordinance, Milwaukee County can only be enjoined from enforcing it *against* Candy Lab, not against any other person or entity as Candy Lab requests. *See Alvarez*, 679 F.3d at 608 (ordering entry of preliminary injunction enjoining State's Attorney from applying statute only against named plaintiff).

Milwaukee County had to respond. And it did. To ensure that it could continue promoting positive interactions for all park visitors, protecting sensitive park areas, showcasing the park system in its entirety and alleviating the pressure on any one park, Milwaukee County enacted Section 47.03 of the Milwaukee County Code of General Ordinances, requiring companies producing "virtual" and "location-based augmented reality games" to obtain a permit before introducing such games into a Milwaukee County park. (Couch Decl. ¶ 25, Ordinance, pp. 1-3.)

## II. Candy Lab's new augmented reality game.

"Augmented reality" is a medium of expression that blends digital content with a person's physical senses to augment that person's perception of physical reality. (Couch Decl. ¶ 5.) Candy Lab's company develops location based, augmented reality software such as its new game called Texas Rope 'Em, a location-based, augmented reality poker game. (Couch Decl. ¶¶ 7-10, 15-16.) Candy Lab makes its money from mobile games such as Texas Rope 'Em. (Couch Decl. ¶¶ 36(g), 44.)

The game is simple. Upon opening Texas Rope 'Em for the first time (after downloading it on a mobile device), the player is asked to create an account consisting of an email address and a password. (Declaration of Madison Benedict ("Benedict Decl."), ¶ 5.) After creating an account and clicking "Cards" on the home screen, the player is shown two random playing cards, which represent part of the player's hand, and five concealed playing cards, which represent the computer-controlled dealer's "House Hand" (hereinafter referred to as the "dealer's hand"). (Benedict Decl. ¶ 6.) To complete his or her hand, the player has to physically visit pre-programmed locations to acquire three more randomly generated playing cards. (Benedict Decl. ¶ 8.)

After clicking "Map" from the home page of Texas Rope 'Em, the player is shown a two-dimensional map identifying the player's current location and card icons identifying locations at which the player could find the additional playing cards to complete his or her hand. (Benedict Decl.

¶ 11.) Upon arriving in the general vicinity of a designated location (a "game stop"), the player presses a button to allow Texas Rope 'Em to access the player's mobile device camera. (Benedict Decl. ¶ 15.)

Thereafter, the map disappears from the screen and is replaced with real-time images of the area, just as if the player had routinely accessed his or her mobile device camera to take a picture of the surroundings. (Benedict Decl. ¶ 16.) The user can point his or her mobile device around the game stop until an image appears that is identical to the card icon shown on the map. (Benedict Decl. ¶ 17.) After clicking on the image, the player is able to select additional cards for the hand by choosing from those randomly displayed. (Benedict Decl. ¶ 18.) Once the player visits various locations and obtains five cards total, the player is able to "play" his or her hand against the dealer's hand by returning to the "Cards" screen accessible from the home page. (Benedict Decl. ¶ 19.) Whether the player wins or loses, the player is able restart the game. (Benedict Decl. ¶ 21.)

On April 21, 2017, Candy Lab filed its Complaint alleging that Section 47.03 of the Milwaukee County Code of Ordinances violates the First Amendment. (ECF No. 1.) Specifically, Candy Lab contends that its new game - Texas Rope 'Em - is a form of free speech protected by the First Amendment and that the Ordinance is an unconstitutional restriction on that free speech. (*Id.*) Count I is for an alleged violation of Candy Lab's First Amendment rights and in Count II, Candy Lab seeks declaratory relief that the Ordinance is unconstitutional. (*Id.*) Candy Lab also filed on the same day a Motion for Preliminary Injunction, asking this Court to preliminarily enjoin Milwaukee County from enforcing the Ordinance (the "Motion"). (ECF No. 6.)

As of the date of this filing, Candy Lab has not submitted a request for a permit to Milwaukee County for Texas Rope 'Em or any other augmented reality game. (Declaration of

Margaret Daun ("Daun Decl."), ¶ 6.) Milwaukee County has not and currently is not enforcing the Ordinance against Candy Lab. (Daun Decl. ¶ 7.)

## STANDARD OF REVIEW

The requirements for a preliminary injunction are well known. Candy Lab must show that: (1) it has at least a reasonable likelihood of success on the merits, (2) it will be irreparably harmed without an injunction, (3) it has no adequate remedy at law, and (4) the threatened injury to it outweighs the threatened harm the preliminary injunction may cause Milwaukee County and the injunction would not otherwise disserve the public interest. *See Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795, 796–97 (7th Cir. 1981).

## ARGUMENT

**I.     Candy Lab is not likely to succeed on the merits of its claims.**

   A.     Candy Lab has no cognizable claim because Texas Rope 'Em is not protected speech under the First Amendment.

Candy Lab cannot succeed on the merits of its claims because it has not alleged any claims upon which relief can be granted (*see* Milwaukee County's Motion to Dismiss). The analysis can end there. Both of Candy Lab's claims are based on alleged violations of its First Amendment rights. But there can be no violation when there are no First Amendment rights to violate. As set forth in Milwaukee County's accompanying Motion to Dismiss, Texas Rope 'Em is not entitled to First Amendment protection because it does not convey any messages or ideas and because it qualifies as illegal gambling in any event.[2]

   *1.     Texas Rope 'Em is not protected speech because it does not convey any messages or ideas.*

---

[2]     To avoid redundancy here, a more thorough analysis describing why Texas Rope 'Em is not protected speech is contained in "Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint" filed contemporaneously herewith.

Candy Lab proclaims that Texas Rope 'Em is "speech" entitled to First Amendment protection because in *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011), the Supreme Court held that video games qualify for First Amendment protection. (Motion, pp. 10-11.) There are two assumptions inherent in Candy Lab's proclamation: one, that Texas Rope 'Em is a video game, and two, that *all* video games are protected speech under *Brown*. Both assumptions are wrong.

First, in Candy Lab's own words, Texas Rope 'Em is a "location-based, augmented reality poker game", not just a video game. (Compl. ¶ 37.) Candy Lab recognizes that its game does not squarely fit within the definition of a video game (whatever that may mean), acknowledging that "[n]o court appears to have yet applied [the *Brown*] holding specifically to video games with augmented reality or location-based features". (Motion, p. 11.) Therefore, for present purposes, Candy Lab has not established that Texas Rope 'Em is a "video game" as contemplated by the Supreme Court in *Brown*.

More importantly, regardless of whether Texas Rope 'Em is called a video game, an augmented reality game, a location-based game, a mobile device game or whatever else, it is not automatically entitled to First Amendment protection simply *because* it is a game or *because* it is a form of entertainment. Contrary to what Candy Lab presumes, *Brown* does not say that *every* video game (whatever that means) automatically enjoys First Amendment protection. Nor does *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 578 (1977) say that *all* forms of entertainment are automatically protected by the First Amendment. *See also United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Rather, "[e]ach medium of expression…must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Se. Promotions, Ltd. v. Conrad*, 420

U.S. 546, 557 (1975). In other words, when confronted with a claim for a First Amendment violation, courts must assess whether the specific medium or activity at issue is "sufficiently imbued with elements of communication to fall within the scope of the First…Amendment[.]" *Spence v. State of Washington*, 418 U.S. 405, 409 (1974).

Applying First Amendment principles to Texas Rope 'Em reveals that *this game* is <u>not</u> speech that the First Amendment was designed to protect. Texas Rope 'Em lacks the characters, dialogue, plots and social messages that the Supreme Court found significant in *Brown*, or the "stories" that the Seventh Circuit found significant in *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (like in "House of the Dead" where the "player is armed with a gun" while "being assailed by a seemingly unending succession of hideous axe-wielding zombies."). Texas Rope 'Em is missing all of those elements. It is more akin to a simulated gambling game where a display of "three cherries" on slot machine does not communicate any ideas, *see Telesweeps of Butler Valley, Inc. v. Kelly*, No. 3:12-CV-1374, 2012 WL 4839010, at *1 (M.D. Pa. Oct. 10, 2012), or like bingo, where the shouting of "B-2" has no meaning, *see There to Care, Inc. v. Comm'r of Indiana Dep't of Revenue*, 19 F.3d 1165, 1167 (7th Cir. 1994). A closer look at Texas Rope 'Em reveals the absence of any stories, plots or meaningful content.

Again, upon opening Texas Rope 'Em for the first time, the player is asked to create an account consisting of an email address and password. (Benedict Decl. ¶ 5.)[3] After creating an account and clicking "Cards" on the home screen, the player is shown two random playing cards, which represent part of the player's hand, and five concealed playing cards, which represent the computer-controlled dealer's "House Hand" (hereinafter referred to as the "dealer's hand"). (Benedict Decl. ¶ 6.) The player's hand and the dealer's hand are shown on a plain brown

---

[3] The Declaration of Madison Benedict also contains screenshots of the various stages of the Texas Rope 'Em game for further visualization of its details.

background that resembles a wooden table. (Benedict Decl. ¶ 7.) To complete his or her hand, the player has to physically visit pre-programmed locations to acquire three more randomly generated playing cards. (Benedict Decl. ¶ 8.)

The sole goal of Texas Rope 'Em is to collect a hand of playing cards that will beat the dealer's hand under the traditional rules of poker. (Benedict Decl. ¶ 9.) Texas Rope 'Em does not provide any fictional backstory that would incentivize the player to win in order to gain access to different parts of the game, unlock certain advantages that would provide an upper hand in beating the dealer, proceed further in some fictional world, or learn additional facts about any game characters that could assist in winning. (Benedict Decl. ¶ 10.)

After clicking "Map" from the home page of Texas Rope 'Em, the player is shown a two-dimensional map identifying the player's current location and card icons identifying locations at which the player could find the additional playing cards to complete his or her hand. (Benedict Decl. ¶ 11.) Texas Rope 'Em provides a map of Austin that is virtually identical to maps of Austin accessible on other phone applications such as Google Maps, Apple Maps, or others intended for personal navigational uses. (Benedict Decl. ¶ 12.) Texas Rope 'Em tracks the player's location in a manner similar to how those other map applications track location and provide the locations of local businesses. (Benedict Decl. ¶ 13.) Other than the card icons identifying the locations where the player can find the needed playing cards, there are no other game-related details added to the map intended to augment the feeling or experience of playing a simulated game. (Benedict Decl. ¶ 14.)

Upon arriving in the general vicinity of a designated location (a "game stop"), the player presses a button to allow Texas Rope 'Em to access the user's mobile device camera. (Benedict Decl. ¶ 15.) Thereafter, the map disappears from the screen and is replaced with real-time images of the area, just as if the player had routinely accessed his or her mobile device camera to take a picture

of the surroundings. (Benedict Decl. ¶ 16.) The user can point his or her mobile device around the game stop until an image appears that is identical to the card icon shown on the map. (Benedict Decl. ¶ 17.) After clicking on the image, the player is able to select additional cards for the hand by choosing from those randomly displayed. (Benedict Decl. ¶ 18.) Once the player visits various locations and obtains five cards total, the player is able to "play" his or her hand against the dealer's hand by returning to the "Cards" screen accessible from the home page. (Benedict Decl. ¶ 19.)

The dealer is not a digital character, nor is there any depiction on any screen of an individual, animal, or other life form, whether realistic or otherwise; rather, the dealer is represented by a box that automatically generates a competing hand. (Benedict Decl. ¶ 20.) Whether the player wins or loses, the player is able to tap a button and restart the process of being dealt two initial cards, visiting locations to gather more cards, and playing a new hand against the dealer's hand again. (Benedict Decl. ¶ 21.) After playing his or her hand against the dealer's hand, there are no options to post results to social media. (Benedict Decl. ¶ 22.)

The digital content of Texas Rope 'Em is limited to images of playing cards and the designated geolocations on a two-dimensional map display. (Benedict Decl. ¶ 23.) From the home screen, there is also a button which directs you to various screens explaining the rules of the game. (Benedict Decl. ¶ 24.) The digital content of this explanatory section is like the rest of Texas Rope 'Em in that the images are simplistic and undetailed. (Benedict Decl. ¶ 25.)

That summary is the sum and substance of the Texas Rope 'Em game. There are clearly no characters, plot lines or dialogue. From that description, what message, story or idea is Candy Lab intending to convey through Texas Rope 'Em? If this Court cannot answer that question, Texas Rope 'Em should not enjoy the protections of the First Amendment.

> 2.    *Texas Rope 'Em qualifies as illegal gambling.*

Texas Rope 'Em is also not protected speech because it constitutes gambling. It is well-established that gambling is not speech protected by the First Amendment. *There To Care, Inc.*, 19 F.3d at 1167 ("Gambling has traditionally been closely regulated or even forbidden, without anyone suspecting that these restrictions violate the first amendment."). The State of Wisconsin prohibits most gambling. Chapter 945 of the Wisconsin statutes describes the various forms of gambling that are illegal and their punishments. Of importance here is the description of an illegal "lottery." Section 945.01 describes a lottery as "an enterprise wherein for a consideration the participants are given an opportunity to win a prize, the award of which is determined by chance, even though accompanied by some skill." Wis. Stat. § 945.01(5). The term "consideration" means "anything which is a commercial or financial advantage to the promoter or a disadvantage to any participant." *Id*.

Texas Rope 'Em, as operated by Candy Lab, is an illegal lottery because it consists of (1) a game of chance, (2) consideration, and (3) a prize. *See* Wis. Stat. § 945.01(5). The cards in Texas Rope 'Em are drawn at random, making it a game of chance. (Couch Decl. ¶ 16.) The consideration is the commercial benefit provided to Candy Lab for downloading Texas Rope 'Em application, which is a source of revenue for Candy Lab (Couch Decl. ¶¶ 36(g), 44), and playing the Texas Rope 'Em application in public, which could also be a source of publicity for Candy Lab. And lastly, winners in Texas Rope 'Em are awarded prizes. (Couch Decl. ¶ 17.) Because it is an illegal lottery, Texas Rope 'Em cannot seek refuge from the First Amendment. For these reasons, Candy Lab has no cognizable claims and therefore no likelihood of success on the merits. That means that a preliminary injunction is not warranted here.

**B.** Even if Texas Rope 'Em is protected speech, Candy Lab's constitutional arguments still fail.

Candy Lab claims that it is likely to succeed on the merits of its claims because it has alleged "three independent ways in which the Ordinance is invalid under the First Amendment-it is a prior restraint, it is unconstitutionally vague, and it is a content-based restriction." (Motion, p. 29.) Candy Lab also asserts that the Ordinance cannot survive strict scrutiny under any of those bases. (*Id.*) But the Ordinance is neither a content-based restriction nor vague (and the strict scrutiny analysis would not apply). Further, the Ordinance is not a prior restraint but rather a permissible time, place and manner restriction.

*1. This case does not involve a prior restraint.*

Candy Lab characterizes Milwaukee County's Ordinance as a "prior restraint." (Motion, p. 15.) Prior restraints are not unconstitutional *per se*, but they do carry a heavy presumption against their validity. *Southeastern Promotions, Ltd.*, 420 U.S. at 558. That said, this case does not involve a prior restraint. First, Candy Lab has not been restrained from doing anything, as Milwaukee County is not enforcing the Ordinance against Candy Lab. (Daun Decl. ¶¶ 6-7.)

Second, the Ordinance does not purport to restrict Candy Lab from publishing any communicative content, but rather appropriately restricts the time, place and manner of an activity. A restriction is a prior restraint only if it meets four elements: (1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision maker is empowered to determine whether the applicant should be granted permission *on the basis of its review of the content* of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the decision maker. *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008).

Here, the Ordinance does not give a decision maker the power determine whether the applicant should be granted permission on the basis of its review of the *content* of the communication. Instead, the Ordinance is a permissible content-neutral time, place and manner restriction that is designed to ensure the safety and convenience of park visitors. "Regulations of the use of a public forum that ensure the safety and convenience of the people are not inconsistent with civil liberties but are one of the means of safeguarding the good order upon which civil liberties ultimately depend." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) quoting *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941).

For example, in *Thomas*, the petitioners challenged the constitutionality of an ordinance that required individuals to obtain permits for large events in the parks. 534 U.S. at 318. Petitioners filed applications for several permits to hold rallies in support of legalizing marijuana, some of which were denied. *Id*. at 319-20. Petitioners argued that the ordinance violated their First Amendment rights. *Id*. at 320. The Court disagreed. *Id*. at 322-25. The Court found that the permitting scheme did not engage in subject-matter censorship but rather was a "content-neutral time, place, and manner regulation of the use of a public forum" *Id*. at 322. The permit procedure was required for all activities that exceed the fifty person limit, regardless of its subject or purpose. *Id*. Additionally, the discretion of individuals reviewing the permit was sufficiently limited to protect against First Amendment violations, as licensing officials may deny a permit only based on the specified reasons set forth in the ordinance. *Id*. at 333-334. The Supreme Court noted that while time, place and manner regulations must contain "adequate standards to guide the official's decision and render it subject to effective judicial review," some degree of discretion is permissible without resulting in a constitutional violation. *Id*. at 323-25.

In this case, the Ordinance is content-neutral, as it does not target any specific content or message. More on that below (*see* Section I.B.3). Rather the Ordinance targets a specific type of game and seeks to restrict use of that game to a specific place and time. (Couch Decl. ¶ 25, Ordinance, p. 3: *see e.g.* "to determine the appropriateness of the application based on site selection" and "Game activity shall only occur during standard park hours"). Also, just like in *Thomas*, the Ordinance also provides specific criteria for approving the application, including site selection, protection of rare flora and fauna, personal safety, and the intensity of game activities on park lands. (*Id.*) That discretion is not unfettered, contrary to Candy Lab's assertions.

Even the permit process is not as open-ended as Candy Lab so colorfully argues. Yes, the permit process reserves the right to request additional information regarding key components of the application, and may postpone approval until all information is received. (Couch Decl. ¶ 34, Permit Application.) But an incomplete application is appropriate grounds for withholding approval. *See Thomas* 534 U.S. at 324 (an incomplete application is an appropriate reason for denying a permit application). And that Milwaukee County does not guarantee approval cannot constitute unfettered discretion, for if approval was guaranteed, there would be no permit process at all. For those reasons, the Ordinance is a content-neutral time, place and manner restriction (one that is consistent with the First Amendment), not a prior restraint.

## 2. *The Ordinance is not vague.*

Candy Lab also proclaims that "the text of the Ordinance is incredibly vague, to the point where it is practically impossible for game developers to discern what type of conduct the Ordinance allows and what it regulates." (Motion, p. 20). Candy Lab specifically takes issue with the following words and phrases in the Ordinance: <u>introduced</u>, <u>games</u>, <u>augmented reality</u>, and <u>location-based</u>. (Motion, pp. 21-24.) It is odd that those words create such confusion for Candy Lab when it

describes its own game using those very words, calling it a "location-based, augmented reality poker game." (Compl. ¶ 37.)

Regardless, none of the terms Candy Lab finds so perplexing are vague on their face or as used in the Ordinance. "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) quoting *United States v. Raines*, 362 U.S. 17, 23 (1960). In *Hill*, the statute at issue made it unlawful within the regulated areas for any person to "knowingly approach" within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person…'" 530 U.S. at 707. To support its challenge to the statute, the plaintiff in that case argued that some terms in the statute were vague and proffered hypothetical theories as to what the statute covered, such as whether an outstretched arm would constitute "approaching." *Id.* at 733. But the Supreme Court found that the "the likelihood that anyone would not understand any of those common words [in the statute] seems quite remote" and therefore, it was "clear what the ordinance as a whole prohibit[ed]." *Id.* at 732-33.

The *Hill* decision is fitting here, as Candy Lab attempts to turn simple words into confusing hypotheticals. Candy Lab first takes issue with the following phrase in the Ordinance: "before any company may *introduce* a location-based augmented reality game into the Parks." (Motion, p. 21.) Apparently, developers do not introduce games, but rather *publish* games. (*Id.*) Are the words "publish" and "introduce" that starkly different? It does not appear that Candy Lab even thinks so; one of its allegations is that the "Ordinance restricts speech by prohibiting the *introduction* of augmented reality games into the County's parks without first obtaining permit." (Compl. ¶ 16)(emphasis added.)

Candy Lab also complains that it is confusing as to which "games" the Ordinance applies. (Motion, pp. 21-23.) But that too has no merit, especially when considering all of the descriptions, photos and details about location-based augmented reality games littered throughout Candy Lab's Complaint and Motion and every Declaration filed in support thereof. Clearly Candy Lab knows that the Ordinance is not about just any game, but specifically the augmented reality games that Candy Lab helps develop. The Ordinance says so itself, prohibiting without a permit only "virtual and location-based augmented reality games." (Couch Decl. ¶ 26.) Candy Lab's CEO even testifies that Texas Rope 'Em "clearly fits" the definition of "virtual gaming." (Couch Decl. ¶ 39.) Candy Lab seems to understand the terms just fine. Compare that with the ordinance in the case that Candy Lab finds so persuasive – that ordinance made it unlawful "to play *any games* upon any street, alley, or sidewalk, or other public places" without a permit. *See Weigand v. Vill. of Tinley Park*, 114 F. Supp. 2d 734, 736 (N.D. Ill. 2000) (emphasis added). Obviously the lack of any descriptor associated with "games" made that ordinance unconstitutionally vague. *Id*. at 738. Here, Milwaukee County has defined the type of game it is intending to regulate.

Surprisingly, Candy Lab also thinks the Ordinance is vague because it does not define "location-based" or "augmented reality." Again, Candy Lab clearly knows what "location-based" and "augmented reality" mean, as it endeavors to define and explain those very terms for this Court. (Motion, p. 2: "location-based applications are those that track the real-time physical location of the device running the application in real time…..); (Motion, p. 3: "Augmented Reality is a medium of expression that combines digital information with the viewer's physical surroundings.") Candy Lab is simply creating ambiguity where there is none. Sure enough, "imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question," which is exactly what Candy Lab tries to do, but "because we are condemned to the use of words, we can never

expect mathematical certainty from our language." *Hill*, 530 U.S. at 733 (internal citations omitted). Any company that develops or publishes location-based or augmented reality games will surely know what those terms mean and that this Ordinance applies to them. Candy Lab's vagueness arguments have no merit.

### 3. *The Ordinance is not a content based restriction.*

Candy Lab also argues that the Ordinance is an impermissible content-based restriction because it "singles out specific categories of mobile software…for more restrictive treatment than other mobile software, other games, other video games, and even other location-based AR content." (Motion, p. 26.) This argument is even more specious than Candy Lab's vagueness argument. The case that Candy Lab relies on explains why.

In *Reed v. Town of Gilbert, Ariz.*, the town's code identified various categories of signs based on the *type of information they conveyed* and then subjected each category to different restrictions. 135 S. Ct. 2218, 2224 (2015). The Supreme Court concluded that the restrictions were impermissible content-based restrictions because they depended "entirely on the communicative content of the sign." *Id*. at 2227. Simply put, content-based laws are those that target speech based on its *communicative content*. *Id*. at 2226. More specifically, "[g]overnment regulation of speech is content based if a law applies to particular speech because of the <u>topic</u> discussed or the <u>idea</u> or <u>message</u> expressed. *Id*. at 2227 (emphasis added). When deciding whether a restriction is content based, the Supreme Court invites courts to ask the following question: does the regulation "on its face" draws distinctions based on the message a speaker conveys? *Id*. The answer to that question is clearly "no" in this case.

Here, the Ordinance speaks only to the *functionality* of game. It has nothing to do with the communicative content of the game. It says nothing about the topic, idea or message conveyed by the game. And it does not draw distinctions between any messages the games could convey. The

Ordinance does not meet *any* of the requirements of a content-based restriction as described by the Supreme Court in *Reed*. Candy Lab's content-based objection to the Ordinance also has no merit.

> 4. *The strict scrutiny analysis does not apply but even if it did, the Ordinance would survive.*

Finally, Candy Lab claims that the Ordinance fails to satisfy "strict scrutiny", but without explaining why strict scrutiny applies or to which of its three constitutional challenges. (Motion, p. 26.) The extent to which limitations on speech are constitutionally permissible depends upon the kind of restriction imposed. True enough, a content-based speech restriction must satisfy strict scrutiny. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). And, logically, a content-based regulation is unconstitutional under strict scrutiny review, as not narrowly tailored, if it is too vague. But content-neutral statutes prescribing the time, place, and manner in which First Amendment rights may be exercised – like the Ordinance here - are analyzed under a lower standard of scrutiny. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986). To sustain a content-neutral time, place, and manner restriction, "the government must show that the restriction (1) is content-neutral, (2) serves a legitimate governmental objective, (3) leaves open ample alternative channels of communication, and (4) is narrowly tailored to serve the governmental objective." *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547, 1552 (7th Cir. 1986), *aff'd*, 479 U.S. 1048 (1987).

Here, it is clear that the Ordinance is not content-based (nor is it vague). Therefore, strict scrutiny should not apply, but rather the lower standard of scrutiny articulated by the Seventh Circuit in *City of Watseka*. The Ordinance satisfies that test. First, again, it is clearly content neutral as it targets no specific content, message, topic or idea. Second, the Ordinance also serves several legitimate governmental objectives. The Ordinance was adopted in response to the sudden mass influx of park visitors that followed the release of Pokémon Go, which led to increased litter and

waste, inadequate bathrooms, after-hours violations, potential security and safety risks, enhanced security, unauthorized vendors, significant traffic congestion, parking violations, trampled grass and damage to surrounding flora and fauna. (Couch Decl. ¶ 25, Ordinance, pp. 1-2.); (Motion, Ex. A, December 15, 2016 Transcript.) The primary goals of the Ordinance are to manage and limit the aforementioned harms caused by location-based augmented reality games in Milwaukee County parks. (*Id*.)

Milwaukee County's goals of conserving the integrity of its park system, ensuring its landscaping and natural elements are preserved, protecting the public who visit the park, maintaining a clean environment and securing an enjoyable time for all visitors are legitimate governmental objectives. *See e.g. Warden v. Nickels*, 697 F. Supp. 2d 1221, 1227 (W.D. Wash. 2010) (city parks department had legitimate governmental purpose of ensuring safety of children and youth in its parks); *Lederman v. N.Y. City Dep't of Parks & Recreation*, 901 F. Supp. 2d 464, 480 (S.D.N.Y. 2012), *aff'd*, 731 F.3d 199 (2d Cir. 2013) (city parks department had legitimate government interest in promoting the use and enjoyment of public parks); *Nat'l Council of Arab Americans, Act Now to Stop War & End Racism Coal. v. City of N.Y.*, 478 F. Supp. 2d 480, 489 (S.D.N.Y. 2007) (city had legitimate interests preventing harm to its parks' "landscaping, planting, or other environmental conditions".) After all, parks are limited spaces and allowing unregulated access to an unlimited influx of visitors could easily reduce rather than enlarge a park's utility as a forum for public speech and expression. *See Cox*, 312 U.S. at 574-76.

Third, the Ordinance leaves open ample alternative channels of communication, namely all other locations throughout Milwaukee County, including dozens of other historical locations and public institutions. Fourth and finally, the Ordinance is narrowly tailored. "A law is narrowly tailored if it does no more than eliminate the exact source of the evil it sought to remedy, an evil that

is not merely a possible by-product of the First Amendment activity but is created by the medium of expression itself." *City of Watseka*, 796 F.2d at 1563 (internal citations omitted). This Ordinance *only* applies to the type of game that causes the unpredictable, unlimited and previously uncontrollable influx of park visitors that first raised concerns. Also, the Ordinance does not prohibit augmented reality games, it only requires companies introducing such game in the parks to request a permit in the same manner as other companies who want to make special use of the park. The Ordinance is narrowly tailored to achieve those objectives. *See e.g. Clark v. Community for Creative Nonviolence*, 468 U.S. 288, 296 (1984) (holding that a regulation forbidding camping narrowly focuses on the government's substantial interest in maintaining the parks in the heart of the capitol in an attractive and intact condition because to "permit camping-using these areas as living accommodation-would be totally inimical to these purposes...."). Because the Ordinance is designed to allow Milwaukee County to exercise minimum control over the process of augmented reality games being introduced in its parks while still allowing companies to operate therein, it is narrowly tailored to serve its intended purpose and thus satisfies the appropriate judicial scrutiny.

## II. Candy Lab will not suffer irreparable harm if an injunction is not issued.

Candy Lab suffers no risk of "irreparable harm" for several reasons. There can be no harm because Candy Lab's game is not protected by the First Amendment and because it is <u>not</u> currently available in Milwaukee County. Also, even if there was a potential for harm, that harm could be remedied by monetary damages.

First, as discussed in further detail above (*see* Section I. A), Candy Lab's game Texas Rope 'Em is not protected speech because it does not express any messages or ideas (and it is illegal

gambling).[4] Because Texas Rope 'Em is not entitled to First Amendment protection, Milwaukee County cannot be impinging upon Candy's Lab First Amendment rights. Candy Lab's Motion can be denied on these grounds alone.

Second, Candy Lab cannot be harmed by Milwaukee County's Ordinance when its game is not even available to be played in Milwaukee County. Candy Lab's CEO testifies that Texas Rope 'Em is available in select cities including Milwaukee. (Couch Decl. ¶ 2.) But that does not appear to be true. When going to download the Texas Rope 'Em application from either the iTunes stores or Google Play, the game's information page explains that it is "only available in Austin, TX." (Declaration of Leslie Gutierrez, ¶¶ 8-9.) Certainly, Candy Lab cannot be harmed by Milwaukee County's Ordinance when its game is not available to be played here.

Lastly, even if Texas Rope 'Em had First Amendment protection and the game was available to play in Milwaukee County, the Ordinance's limitation on Candy Lab's ability to introduce its game in Milwaukee County parks can be remedied. Candy Lab relies heavily on the statement in *Elrod v. Burns*, 427 U.S. 347, 373 (1976) that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." That statement was made, however, in the context of political speech, which often relates to fleeting issues and becomes stale when the issue passes.

Here, Candy Lab's only harm will be a delay in introducing Texas Rope 'Em in Milwaukee County parks. The Milwaukee County parks make up a minute fraction of the square miles available in the country for Candy Lab to introduce its game. If the Court ultimately does declare the Ordinance unconstitutional, Candy Lab can be made whole by an award of damages. *See e.g. Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 599 (7th Cir.1984) (the phrase "irreparable harm"

---

[4] This argument is also further addressed in "Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint", filed contemporaneously herewith.

means that the plaintiff is unlikely to be made whole by an award of damages or other relief at the end of trial); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."). That potential "harm" is not enough to support granting an injunction.

## III. Candy Lab has traditional remedies at law.

As noted above, Candy Lab has remedies at law, and, in fact, it seeks one. In Candy Lab's prayer for relief, it asks this Court to "[a]ward damages in an amount to be determined." (Compl. ¶ 92 F.) Unlike in other First Amendment cases, such as those involving political speech, the quantification of Candy Lab's injury will not be impossible and monetary damages will be appropriate. Assuming the Ordinance is ultimately declared unconstitutional, Candy Lab will be entitled to damages in the form of estimated lost profits that may have accrued during the time period in which the purportedly unconstitutional Ordinance was in place. *See e.g. Signode Corp. v. Weld-Loc Sys., Inc.*, 700 F.2d 1108, 1115 (7th Cir. 1983) (holding that patentee in a patent infringement suit was not entitled to preliminary injunction where patentee failed to meet burden of establishing irreparable harm because that patentee could be compensated for its lost profits). Because Candy Lab is not at risk for irreparable harm and has an adequate remedy at law, a preliminary injunction is not warranted and Candy Lab's Motion should be denied on these grounds as well.

## IV. The balance of harms and public interest weigh in favor of denying the injunction because granting the injunction would disserve the public interest.

Candy Lab asserts that if a party establishes a likelihood of success on the merits of a First Amendment claim, then the balance of harms and public interest unquestionably weigh in favor of an injunction based on the proposition that "there can be no irreparable harm to a local government when it is prevented from enforcing an unconstitutional statute". (Motion, p. 29, citing *Alvarez*, 679

F.3d at 590). Candy Lab has not established a likelihood of success. But also, the inquiry does not end there. In one of the cases relied upon by Candy Lab, the court explains that "it is sometimes necessary to inquire beyond the merits." *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004). That is because a court should not grant a preliminary injunction that will disserve the public interest. *Machlett Labs., Inc.*, 665 F.2d at 797-98 (reversing the grant of a preliminary injunction because it would disserve the public interest in health care and in low-cost health care). Courts should not forgo balancing harm with public interest even if a plaintiff has established a likelihood of success. *See e.g., Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1059 (7th Cir. 2016) ("The district court was aware of the possible legal validity of the Petition Plaintiffs' claim, but the court also well understood that other factors had to be weighed carefully before a preliminary injunction could be granted"). Neither should this Court.

A balancing of the harms and public interest here supports denying Candy Lab's request for a preliminary injunction. How is allowing Candy Lab, a California corporation led by a California resident, unfettered access to the use of Milwaukee County parks to generate revenue at the expense of Milwaukee County taxpayers supposed to benefit the "public interest"? That clearly serves Candy Lab's interests. Perhaps it also serves the gamers in Milwaukee County who will want to play Texas Rope 'Em, but they can still do that, anywhere else in Milwaukee County.

On the other hand, if the injunction is granted, Milwaukee County is stymied in doing one of the many things its residents and taxpayers expect, maintain and preserve the parks. That amplifies the risk for more congestion, litter, safety risks, disruptions, damage, etc. The potential increase in costs is also unlimited. Meanwhile, the harm to Candy Lab is not being able to introduce Texas Rope 'Em in very limited locations in one county in the entire country. Whether that limitation would even affect Candy Lab's bottom line is questionable, but even if it did, those losses could be

recouped in damages if Candy Lab prevails at the conclusion of this case. Balancing the harms and considering the public's interests, this Court should deny the injunction.

**<u>CONCLUSION</u>**

For all of the foregoing reasons, this Court should deny Plaintiff's Motion for a Preliminary Injunction.

Dated this 31st day of May, 2017.

s/ Charles H. Bohl
Charles H. Bohl
Andrew A. Jones
Timothy H. Posnanski
Leslie A. Gutierrez
HUSCH BLACKWELL LLP
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819
(414) 273-2100 / (414) 223-5000 Fax
Charles.Bohl@huschblackwell.com
Andrew.Jones@huschblackwell.com
Timothy.Posnanski@huschblackwell.com
Leslie.Gutierrez@huschblackwell.com

*Attorneys for Defendants*
