UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CANDY LAB, INC,   Case No. 17-cv-00569-JPS

       Plaintiff,   Hon. J.P. Stadtmueller

v.

MILWAUKEE COUNTY, et al,

       Defendants.
_____/

**REPLY BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.      Candy Lab AR Is Exceptionally Likely to Prevail on the Merits ............................ 2

           A.      The Ordinance Is Not a Valid Time, Place, and Manner Restriction .......... 3

                 1.      The Ordinance Is Not Narrowly Tailored ....................................... 3

                 2.      The Ordinance Is Content-Based ..................................................... 6

           B.      The Ordinance Is a Prior Restraint ............................................................. 7

           C.      The Ordinance Is Hopelessly Vague ............................................................ 9

           D.      The County's Criticisms of Texas Rope 'Em Are Red Herring and Do Nothing to Bolster the Constitutionality of its Ordinance ................... 11

    III.    Irreparable Harm Is Evident on the Record and Presumed in Cases Like This One ................................................................................................................ 14

    IV.    The Parties' and Public's Interests Weigh Heavily in Favor of an Injunction ............................................................................................................ 15

## TABLE OF AUTHORITIES

**Page No.**

*ACLU v. Alvarez*
  679 F.3d 583, 607 (7th Cir. 2012) ................................................................................ 3

*Am. Amusement Machine Ass'n v. Kendrick*
  244 F. 3d 572 (7th Cir. 2001) ...................................................................................... 9

*Berger v. City of Seattle*
  569 F.3d 1029, 1051 (9th Cir. 2009) .......................................................................... 6

*Braun v. Terry*
  148 F. Supp. 3d 793, 803-04 (E.D. Wis. 2015) ........................................................... 3

*Butler v. Michigan*
  352 U.S. 380, 383 (1957) ............................................................................................ 5

*Calchera v. Procarione*
  805 F. Supp. 716, 718 (E.D. Wis. 1992) ..................................................................... 2

*Connally v. Gen. Constr. Co.*
  269 U.S. 385, 392 (1926) .......................................................................................... 10

*Elrod v. Burns*
  427 U.S. 347 (1976) .................................................................................................. 14

*Flower Cab Co. v. Petitte*
  685 F.2d 192, 195 (7th Cir. 1982) ............................................................................. 14

*Freedman v. Maryland*
  380 U.S. 51 (1965) ...................................................................................................... 9

*FW/PBS v. City of Dallas*
  493 U.S. 215 (1990) .................................................................................................... 7

*Hodgkins ex rel. Hodgkins v. Peterson*
  355 F.3d 1048, 1056 (7th Cir. 2004) ......................................................................... 12

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*
  460 U. S. 575, 583 (1983) ........................................................................................... 7

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*
  823 F. Supp. 2d 36, 51 n.32 (D.D.C. 2011) .............................................................. 14

*Samuelson v. LaPorte Cmty. Sch. Corp.*
    526 F.3d 1046, 1051 (7th Cir. 2008) ....................................................................................... 7

*Southeastern Promotions, Ltd. v. Conrad*
    420 U.S. 546, 559-60 (1975) ................................................................................................... 8

*Thomas v. Chicago Park Dist.*
    534 U.S. 316 (2002) .................................................................................................................. 8

*Turner Broadcasting System, Inc. v. FCC*
    512 US 622, 642-43 (1994) ...................................................................................................... 6

*Watseka v. Illinois Public Action Council*
    796 F.2d 1547, 1563 (7th Cir. 1986) ....................................................................................... 3

*Weigand v. Village of Tinley Park*
    114 F. Supp. 2d 734, 738 (N.D. Ill. 2000) ................................................................................ 6

**INTRODUCTION**

Suppose a famous author wrote a spellbinding mystery novel about events in Milwaukee's Lake Park. For all the serendipitous reasons that drive public tastes, the book becomes an overnight sensation. Hordes of avid readers descend upon the park to experience for themselves the locations the author so vividly brought to life, and to re-enact key scenes from the book—all for the sheer enjoyment of doing so. Indeed, the book even encourages this. For a time, the crowds are unprecedented, and occasionally unruly. Neighbors complain. The fad evaporates after a few months, although there will always be a small percentage of future park visitors who are motivated by their discovery or memories of that novel.[1]

Would these events give Milwaukee County the right to pre-screen novels about its parks, and to require writers and publishing houses to obtain a costly permit, insurance coverage, and provide for bathrooms, trash pickup, and security services in the park—just in case another writer turns out a similar page-turner?

Of course not. The very thought is absurd, and anathema to everything the First Amendment stands for. Substitute "virtual and location-based augmented reality games" for "book" in that hypothetical, however, and you have the Ordinance that Defendants in this case (collectively, "the County") passed in response to the Pokémon Go fad.

The County suggests that the Court not concern itself with whether the Ordinance unconstitutionally punishes and chills free speech because Candy Lab AR's latest application, "Texas Rope 'Em," doesn't deserve constitutional protection. That argument gets both the facts and the First Amendment wrong in multiple ways. The app does, in fact, contain more than enough content and interactivity to surpass the extremely low bar for protected speech—and will continue to add even more content. The mere use of a poker theme doesn't make it "gambling" any more than the hundreds of other poker apps on the market, especially when the elements of

---

[1] Such reactions are not uncommon. *See*, *e.g*., "The Top 15 Tourist Destinations Inspired By Film And TV," Buzzfeed, < https://www.buzzfeed.com/annamendoza/middle-earth-wins> (last visited June 12, 2017) (**Ex A**); Dec. of Ori Inbar ¶70 (*Star Wars*-inspired tourism).

1

consideration and prizes are so wholly lacking. Most importantly, however, the County's argument simply doesn't matter under the Supreme Court's First Amendment case law. Everything the County says about Texas Rope 'Em could be true, and Candy Lab AR would still have standing to challenge the Ordinance's glaring unconstitutionality.

The County's Response gives virtually no substantive argument, because there is no justification for a municipality regulating speech in the hopes of preventing unwanted citizen behavior. Thus, the County has all but conceded the merits of Candy Lab AR's requested injunction,[2] and the record supports issuing it. The Court should grant Candy Lab AR's motion.

## ARGUMENT

### I. Candy Lab AR Is Exceptionally Likely to Prevail on the Merits

There is no disagreement among the parties that the County's Ordinance imposes conditions on mobile application publishers' right to distribute certain types of games. The only question is how to evaluate the propriety of that restriction.

Defending the constitutionality of any restriction on speech is a steeply uphill climb. "While the freedom of speech secured by the First Amendment is not absolute, it is among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment. Thus, whenever a state passes a law burdening freedom of speech, that law must be analyzed under the strict scrutiny test. Strict scrutiny requires the State to show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Calchera v. Procarione*, 805 F. Supp. 716, 718 (E.D. Wis. 1992) (Stadtmueller, J.) (quotations and ellipses omitted). "[E]ven if the state does have a compelling interest, the statute must be narrowly tailored to achieve that interest; the statute must not be overbroad and the legislature must have chosen the least restrictive means of regulation." *Id*. The parties agree this strict scrutiny applies to prior restraints, to statutes that are overbroad due to

---

[2] "To be sure, the court is under no obligation to make the defendants' case for them. A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." *Swaffer v. Cane*, 610 F. Supp. 2d 962, 967 (E.D. Wis. 2009) (Stadtmueller, J.) (quote omitted).

2

vagueness, and to content-based regulations, *see* Response at 16, 22[3]—all of which Candy Lab AR alleges the County's Ordinance to be.

The County asserts, however, that its Ordinance is merely a content-neutral regulation of the time, place, and manner in which speech is conducted. "[T]he time, place, and manner of a speaker's activities can be regulated without violating the First Amendment so long as the restrictions are (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication." *Braun v. Terry*, 148 F. Supp. 3d 793, 803-04 (E.D. Wis. 2015) (Stadtmueller, J.) (quotations omitted). Candy Lab AR disagrees that the Ordinance is a time, place, and manner restriction, for the reasons it has already given. Yet even this level of scrutiny is too demanding for the Ordinance to survive.

### A. The Ordinance Is Not a Valid Time, Place, and Manner Restriction

"The requirements for a time, place, and manner restriction are conjunctive." *ACLU v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012) (citation omitted). Thus, for example, when the challenged law "is not closely tailored to the government's interest ..., [the Court] need not [evaluate the remaining factors such as] decid[ing] whether it leaves open adequate alternative channels for this kind of speech." *Id*. Here, the Ordinance fails at least the narrow tailoring and content-neutrality elements, and thus cannot be a valid time, place, and manner restriction.

#### 1. The Ordinance Is Not Narrowly Tailored

"A law is narrowly tailored if it does no more than eliminate *the exact source of the evil* it sought to remedy, an evil that is *not merely a possible by-product* of the First Amendment activity but is created *by the medium of expression* itself." Response at 23-24, quoting *Watseka v. Illinois Public Action Council*, 796 F.2d 1547, 1563 (7th Cir. 1986), *aff'd*, 479 U.S. 1048 (1987) (citations omitted, emphasis added). "[I]f there is a less restrictive alternative to a challenged regulation, then the ordinance is not as precise and narrowly drawn as it could be, and the

---

[3] Citations to record documents are to the page numbers generated by the CM/ECF system.

regulation unnecessarily interferes with First Amendment rights." *Id.* at 1553. A law that regulates speech or conduct beyond its "intended evil" is called "overbroad."

This Ordinance is a paradigmatic example of overbreadth. The County identifies its goals as "conserving the integrity of its park system, ensuring its landscaping and natural elements are preserved, protecting the public who visit the park, maintaining a clean environment and securing an enjoyable time for all visitors." Response at 23. The County's only explanations of why its Ordinance is narrowly tailored to achieve these goals are that (1) it targets "the type of game that causes the unpredictable, unlimited and previously uncontrollable influx of park visitors," *id*. at 24, and (2) that the games are not prohibited once they receive a permit. *Id.*

But that analysis is flawed on multiple levels. Not only does the record fail to support the proposition that location-based AR games are necessarily "the type of game" that inherently causes mass, chaotic disruption, it strongly suggests the exact *opposite* conclusion. The undisputed testimony of three declarants (as well as simply browsing any mobile app store) shows that dozens of such games have been available for at least the past seven years. Inbar Dec. ¶¶23-44; Skwarek Dec. ¶¶17-22; Couch Dec. ¶¶10-14. This includes Ingress, a game functionally identical to Pokémon Go that was published in 2011 and that has been played worldwide ever since. Inbar Dec. ¶37. The number of relevant games is multiplied when one adds location-based mobile games that do not include an AR component (since it is only the location-based aspect that drives players to visit public parks and other geolocations).[4] *Id*. ¶¶32, 44. Of all of these games over all that time, the *only one* that (briefly) led to unusually high volumes of players in public parks was Pokémon Go—an isolated, serendipitous fad that had already dissipated by the time the Ordinance was adopted. Motion & Brief Ex B at 3. The fact that all of these other games escaped the County's notice establishes that, while park congestion may be, in *Watseka*'s words, "a possible by-product of the First Amendment activity"—and that

---

[4] Pokémon Go demonstrates this, since its AR component is a minimal and optional part of the game. Inbar Dec. ¶40. In addition to being overbroad, the Ordinance is under-inclusive in that it only targets games that have both location-based functionality and an AR display component, but not all location-based games. Motion & Brief at 38.

4

littering and similar concerns *might* be a by-product of such congestion—these are *not* dangers intrinsically "created by the medium of expression itself." *Watseka*, 796 F.2d at 1563.

Rather than regulating congestion, littering, and the destruction of flora and fauna, the Ordinance travels upstream to target the speech the County fears will cause those problems—what the Supreme Court calls "burn[ing] the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). This approach will inevitably cause the suppression of far more speech than intended, including art and political speech. *See Weigand*, 114 F. Supp. 2d at 737 ("The ordinance clearly sweeps in much protected conduct. A game might be part of a political protest, to take the clearest case...."); Skwarek Dec. ¶¶7-16 (an expert describing political speech in AR); *see also* Inbar Dec. ¶55(b)(iii) (could include consumer review and navigation apps). What is more, every single example in the record of a location-based AR game is one that can be played in multiple locations throughout the world—not simply in Milwaukee. The Ordinance forces publishers to either completely re-write their games to function everywhere *except* Milwaukee (which may or may not be feasible), or else pull them off the market entirely. Further, the inclusion of "virtual games"—an invented term defined so broadly (as covering interaction with a 3D-environment that "typically" includes artificial images and sounds, Motion & Brief Ex. D) as to include running through the park while wearing a Fitbit, or two children playing with battery-powered toys, Inbar Dec. ¶55(a)—increases the scope of activity the Ordinance regulates by orders of magnitude. The County ignores all of these points.

The County's Response is also silent regarding the various less-restrictive alternatives listed in Candy Lab AR's Motion. The most obvious of these is simply to enforce the existing laws against littering and destruction of park property, which was the response that every other municipality in the country had to the Pokémon Go fad—or roping off areas of the park, charging for access, increasing police presence to ticket wrongdoers, or selling refreshments. Motion & Brief Ex B at 3. The variety of these options underscores the Ordinance's overbreadth.

5

### 2. The Ordinance Is Content-Based

The County claims that its Ordinance is content-neutral because it is concerned only with whether an application has AR and location-based *functionality*, and not with the *viewpoint* expressed by any particular game. But "[d]eciding whether a particular regulation is content based or content neutral is not always a simple task.... [W]hile a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases. Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content." *Turner Broadcasting System, Inc. v. FCC*, 512 US 622, 642-43 (1994).

The Ordinance is content-based because it enables and requires law enforcement to determine whether a particular application constitutes a "game," and then prescribes different treatment depending on the answer. "Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns." *Id.* at 659; *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) ("A regulation is content-based ... if the regulation, by its very terms, singles out particular content for differential treatment") (following *Turner*). Candy Lab AR's lengthy quote from *Weigand v. Village of Tinley Park*, 114 F. Supp. 2d 734, 738 (N.D. Ill. 2000) (granting preliminary injunction) demonstrates just how subjective and context-specific the definition of "game" is. The County asserts that the qualifiers "location-based" and "AR" somehow remedy that problem. That makes no sense, because those terms describe components of the game, not what *makes* it a "game." But it also ignores the Ordinance's inclusion of "virtual games," which it says "typically consists of an artificial world of images and sounds created by a computer that is affected by the actions of a person who is experiencing it." Motion & Brief Ex D at 2. One cannot help but examine an app's content to determine whether that definition is satisfied, and the word "typically" indicates a reservation of subjective discretion in its application.

Independently, the Ordinance is content-based because it singles out a particular subset of developers and applications, and imposes upon them (and only them) a draconian logistical and

6

tax burden. It is no small matter for software publishers to complete and submit the Permit Application required by the Ordinance. *See* Couch Dec. ¶¶31-34; Motion & Brief Ex. E. That requirement is itself a content-based discrimination meriting strict scrutiny. *See*, *e.g.*, *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U. S. 575, 583 (1983) (applying strict scrutiny to a use tax imposed on the paper and ink used in the production of newspapers because it applied only to the press; and in practical application it fell upon only a small number of newspapers);[5] *FW/PBS v. City of Dallas*, 493 U.S. 215 (1990) (permit scheme for sexually oriented businesses was prior restraint even though it did not consider the content of the speech involved, because it imposed an inspection requirement more onerous than the one applied to vast majority of other businesses). Because the Ordinance is not even close to being narrowly tailored and is content-based, it is unconstitutional regardless of the scrutiny applied.

### B. The Ordinance Is a Prior Restraint

The parties agree on the definition of a "prior restraint": "(1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the decision maker." *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008) (quotation omitted). The County does not seriously dispute that elements (1)[6] and (3)[7] are satisfied, but

---

[5] *See also Grosjean v. Am. Press Co.*, 297 US 233 (1936) and *Arkansas Writers' Project, Inc. v. Ragland*, 481 US 221, 231(1987), cited by *Turner*, 512 U.S. at 659-60 for the same proposition.

[6] At one point, the County denies that prohibiting developers from "introducing" a game "purport[s] to restrict Candy Lab from publishing any communicative content," Response at 16, but in nearly the same breath asks rhetorically, "[a]re the words "publish" and "introduce" that starkly different?" *Id*. at 19. This erases all doubt that the Ordinance prohibits publication.

[7] The County claims the Ordinance isn't restraining Candy Lab AR because the County hasn't elected to enforce it against Candy Lab AR yet. But "plaintiffs need not violate the Ordinance and risk prosecution in order to challenge it. The very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." *Ezell v. City of Chicago*, 651 F. 3d 684, 695-96

argues "the Ordinance is content-neutral, as it does not target any specific content or message," Response at 17, and that its discretion to deny a permit is not "unfettered." *Id*. at 18.

For the reasons previously articulated, the Ordinance is not content-neutral. The suggestion that the County's discretion under the Ordinance is in any way limited is also false. That is made evident most clearly by the Permit Application, which states plainly, "**Milwaukee County Parks in its sole discretion may grant, deny, revoke or suspend any permit, at any time and for any reason.**" Motion & Brief Ex. E at 4 (emphasis added). The Ordinance adopts the Permit Application by reference, and neither document puts any limit on this discretion.

If that were not clear enough, it is also obvious that the Ordinance contains none of the safeguards required by First Amendment jurisprudence. The County hangs its hat on *Thomas v. Chicago Park Dist*., 534 U.S. 316 (2002), which upheld as a content-neutral time, place, and manner restriction a permitting scheme that controlled park access by requiring a permit for all events involving more than 50 people. But under that scheme, the municipality could "deny a permit only for one or more of the [content-neutral] reasons set forth in the ordinance," *id*. at 324. *Thomas* went on to say that, "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content" and is impermissible." *Id*. at 323. In such cases, "a system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: *First*, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second*, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third*, a prompt final judicial determination must be assured." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559-60 (1975); *Thomas*, 534 U.S. at 321. The Ordinance contains no such safeguards.

---

(7th Cir. 2011) (quotations omitted). Moreover, it has only been about two months since the County confirmed in writing that Candy Lab AR is required to seek a permit and sent it a copy of the Permit Application. On information and belief, the County has also insisted that Niantic (publisher of Pokémon Go) fill out the Permit Application.

8

Case 2:17-cv-00569-JPS   Filed 06/14/17   Page 12 of 20   Document 20

More fundamentally, *Thomas* and its line of park-permitting cases simply don't fit here. The Ordinance and Permit Application shoehorn virtual and AR games into a scheme designed for an "event," which is "something that occurs in a certain place during a particular interval of time."[8] But a mobile software application is not an "event." It does not have a beginning and ending date. A developer who publishes a software program in an app store cannot know ahead of time how many people will download or use it, or when. Therefore, as Candy Lab AR has already explained and the County has chosen to ignore, publishers literally cannot provide the information required by the Permit Application. And to provide the required insurance, trash removal, bathrooms, and security services, publishers would need to make these available all day, every day, for any number of people—a financially and practically impossible demand.

A software program—as much as books or maps or films—is speech, not an "event." Thus, the Ordinance is a prior restraint for the same reason it is not narrowly tailored. Instead of regulating conduct and park access, it regulates speech based on the effect that the County predicts it might have on user conduct and park access. That makes the Ordinance indistinguishable from other cases condemning censorship of speech based on the behavior the government fears it will incite. *See Freedman v. Maryland,* 380 U.S. 51 (1965) (film censorship board); *Am. Amusement Machine Ass'n v. Kendrick*, 244 F. 3d 572 (7th Cir. 2001) (violent video games). "[A] licensing body likely will overestimate the dangers of controversial speech when determining, without regard to the film's actual effect on an audience, whether speech is likely to incite or to corrupt ...." *Thomas*, 534 U.S. at 321 (quotations and brackets omitted).

### C. The Ordinance Is Hopelessly Vague

The County's only response regarding the vagueness of its Ordinance is to insist (without evidence) that its terms are self-defining, and that those who are regulated will know it. Response at 21. Even if true, that is irrelevant; the issue is not what a particular party or group understand terms to mean, but rather how the government will interpret words when it enforces

---

[8] <http://www.dictionary.com/browse/event> (last visited June 12, 2017).

9

Case 2:17-cv-00569-JPS   Filed 06/14/17   Page 13 of 20   Document 20

them. A regulation is void for vagueness if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 392 (1926). Ori Inbar, who is as knowledgeable on the topic as anyone, Inbar Dec. ¶¶3-9, spells out different ways that "game," "virtual gaming," and "augmented reality" might reasonably be interpreted, five credible interpretations of "location-based," and the vagueness of the "not permitted" and "introduce ... into" clauses. *Id*. ¶55; *see id*. ¶39 ("'Clandestine Anomaly' ... [AR] game is arguably location-based ... in a way that differs from [the other] examples"); Skwarek Dec. ¶¶27-30; Couch Dec. ¶30. Coupled with the Permit Application's expressly boundless definition of "virtual gaming," the entire Ordinance is rendered incoherent.

These ambiguities become significantly more important in light of the ever-decreasing levels of sophistication needed to create location-based AR and virtual content. In just the two months since Candy Lab AR prepared this lawsuit, three of the most popular digital service providers in the country—Snapchat, Facebook, and Apple—have each launched their own tools that allow any individual to create such content. 2d Couch Dec. ¶¶13-17; *cf*. Inbar Dec. ¶27 (Apple); *id*. ¶42 (Microsoft). The County's insistence that this lawsuit merely benefits profit-making[9] Californians[10] rings hollow when any local resident can create similar content.

---

[9] The fact that speech is sold is irrelevant to First Amendment rights. "[C]ompensation provides a significant incentive toward more expression. This proposition is self-evident even to those who do not fully accept Samuel Johnson's cynical comment: 'No man but a blockhead ever wrote, except for money.' By denying [plaintiffs] that incentive, the [Ordinance] induces them to curtail their expression [in violation of the First Amendment]." *United States v. National Treasury Employees Union*, 513 US 454, 469 & n.14 (1995).

[10] The County's cynical appeal to protectionist sentiment also insults the creative and diverse work being done in AR by Wisconsin residents. *See* **Ex B** (examples of local AR companies).

### D. The County's Criticisms of Texas Rope 'Em Are Red Herring and Do Nothing to Bolster the Constitutionality of its Ordinance

The County's primary argument is that Candy Lab AR's most recent mobile app deserves no First Amendment protection. (It never explained why this matters, but presumably it intended to say this negates Candy Lab AR's standing.) This argument fails for several reasons.

First, it is incorrect as a factual matter. Texas Rope 'Em does contain a sufficient amount of expressive content to qualify as speech. As Andrew Couch already testified, "the current release of 'Texas Rope 'Em' is in its initial, '1.0' stage. Consequently, it does not yet contain much of the content that it soon will." 2d Couch Dec. ¶2; 1st Couch Dec. ¶¶22. It will soon include "social media sharing, a feature that has been advertised," 2d Couch Dec. ¶2, and "the ability for certain individuals to add their own game stops to the game map." *Id.*; 1st Couch Dec. ¶24. But even as-is, "[t]he entire app is designed around a 'Texan' theme, with [a] Western-style graphics and color scheme ... evocative of the ['Texas'] game titles, but is in no way dictated by the rules of the poker game itself." 2d Couch Dec. ¶3. "Further, when players [select a card], the game displays an animated rope that whips forward, forms a lasso, grabs the card, and pulls it into the player's hand. This [accentuates the] ... immersive illusion that the player is a cowboy 'russling up' playing cards as if they were cattle." *Id.* ¶6; Coen Dec ¶6. The "dealer," though not seen, is still "a character in the game ... who plays his own hand of cards against the player." 2d Couch Dec. ¶4. Moreover, "it is impossible to separate [the AR] 'function' from the subjective effect the total experience has on the player. Playing a location-based AR game like this one requires players to identify and travel to certain coordinates on a map, which in itself adds a 'scavenger hunt' feeling of discovery and detective work to the experience. ...[T]he player must then find the game stop in three-dimensional space, using ... a radar-like sensor display .... This ... creates an immersive illusion that is fun for users to participate in." *Id.* ¶5.[11]

---

[11] *See also* Inbar Dec. ¶35 ("[In AR,] the location and the image blend to form a unique expression"); *id.* ¶72 ("The very act of a software developer assigning AR content to a particular location is, in and of itself, a creative and expressive choice").

Nor is Texas Rope 'Em illegal gambling under Wisconsin law, an argument based on assumptions that contradict the record. Candy Lab AR receives no consideration for Texas Rope 'Em, which can be downloaded for free and offers no in-app purchases yet. 1st Couch Dec. ¶36(g). The ability to win prizes is a planned feature, but not yet available, *see generally* County's Benedict Dec. (providing no evidence of consideration or prizes when playing Texas Rope 'Em). When it is introduced, Candy Lab AR will follow the legal advice it has already received for ensuring it complies with gaming laws. 2d Couch Dec ¶7. It should not be difficult, seeing as literally hundreds of other mobile poker games are available in app stores, *id*. ¶11 & Exs. 1 & 2—including the iOS App Store, which Apple polices for unlawful gambling. *Id*. ¶9.

Second, because the creation of location-based AR content is Candy Lab AR's business, it is sufficiently injured by the Ordinance to challenge it even under a typical standing analysis. 1st Couch Dec. ¶¶4-11; 2d Couch Dec. ¶12. The subject matter of this lawsuit is the Ordinance and "the medium of expression itself," *Watseka*, 796 F.2d at 1563, not any one particular app.

Third and most importantly, however, typical standing rules do not apply to First Amendment overbreadth challenges like this one, so it is simply irrelevant whether the County's assessment of Texas Rope 'Em is correct. "In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman v. Maryland,* 380 U.S. 51, 56 (1965). "The overbreadth doctrine allows an attack on the facial validity of a statute even though the conduct of the person attacking the statute could be regulated by a statute drawn with the requisite narrow specificity." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004). "The theory behind the doctrine is that a 'statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" [12] *Id*., quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Put

---

[12] *See also Grutzmacher v. Howard Cty*., 851 F.3d 332, 348 (4th Cir. 2017) ("When a plaintiff challenges a government policy for vagueness or overbreadth, the Supreme Court has concluded

differently, there do need to be First Amendment rights at stake in order to bring a First Amendment claim, but they need not be Candy Lab AR's rights. The mere existence of the Ordinance chills the free expression of authors and creators across the country. Inbar Dec. ¶¶55(e), 68; Skwarek Dec. ¶¶24-26. As the County says, "[a]ny company that develops or publishes location-based or augmented reality games will surely know ... that this Ordinance applies to them," Response at 21—and thereby be deterred from exercising their right to publish software.

That is precisely the type of claim Candy Lab AR has brought. Specifically, Candy Lab AR alleges that the Ordinance gives the County overly broad authority to issue permits for—*i.e.*, to license—the publication of virtual and location-based augmented reality games. *See id.* ¶¶33-35, 51-65. On this basis, the Ordinance violates the First Amendment, "facially and as applied," Compl. ¶¶89, 91, 92A-D, because it is "a prior restraint on speech," *id*. ¶92B, "an unlawful content-based-regulation of speech," *id*. ¶92C, and "because it does not provide adequate notice to a person of ordinary intelligence concerning the speech it proscribes and therefore unconstitutionally chills speech." *Id*. ¶92D; *see also id*. ¶¶2, 3, 78-88, 90 (similar).

The County cannot avoid the fundamental unconstitutionality of the Ordinance just by shooting the messenger. Candy Lab AR's Complaint seeks to vindicate not only its own First Amendment rights, but also those of the entire AR and mobile gaming industries. *Any* company that publishes a "virtual or location-based augmented reality game" playable in Milwaukee County parks is potentially subject to liability under the Ordinance. It would be a perverse result if the law allowed, much less required, this Court to ignore a glaring constitutional deficiency in an ordinance suppressing an entire medium of expression merely because the plaintiff's own mobile app was an allegedly imperfect test case. Fortunately, that is not the law.[13]

---

that he has standing to assert the rights of third parties whose protected speech may have been impermissibly curtailed by the challenged prohibition, even though as applied to the plaintiff, the policy only curtailed unprotected expression") (quotation and brackets omitted).

[13] Following the County's lead, Candy Lab AR will unpack these arguments in more detail in its Response to the County's pending Motion, and incorporates that discussion herein by reference.

**III. Irreparable Harm Is Evident on the Record and Presumed in Cases Like This One**

Irreparable harm is presumed when First Amendment speech rights are abridged. *Elrod v. Burns*, 427 U.S. 347 (1976); *Higher Society of Indiana v. Tippacanoe County*, __ F.3d __, No. 17-1089, *slip op.* at 5 (7th Cir. June 7, 2017) ("the analysis begins and ends with the likelihood of success on the merits of the First Amendment claim" (quotation and brackets omitted)). The County (citing no authority) says this rule only applies when the speech being suppressed is political in nature, but courts have repeatedly held the suppression of *any* type of protected speech to be presumptively irreparable.[14] The Ordinance's chilling effect on future speech is sufficient; "plaintiffs are not required to sit idly and wait for irreparable and irretrievable harm to occur before they may seek relief." *R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 823 F. Supp. 2d 36, 51 n.32 (D.D.C. 2011). Besides, the Ordinance is so overbroad as to encompass pure political speech. Skwarek Dec. ¶¶7-16; Inbar Dec. ¶¶22(g), 27.[15]

Money damages are not an adequate remedy for First Amendment violations. *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982); *Higher Society*, *slip op.* at 5. The County ignores this well-established rule, citing only one patent case to argue that the Court can award Candy Lab AR its lost profits at the end of the case. But Candy Lab AR has not yet made any money on Texas Rope 'Em, and does not know when it will. 2d Couch Dec.¶10. Moreover, the lost ability to profit is not the sole, or even the primary, injury resulting from the inability to exercise free speech rights.[16]

---

[14] *See*, *e.g.*, *Entm't Software Ass'n v. Chi. Transit Auth.*, 696 F. Supp. 2d 934, 940-41 (N.D. Ill. 2010) (following *Elrod* to find challenge to video game ads presumptively alleged irreparable harm); *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) (holding "the very nature of" challenge to ban on public nudity "satisfies the requirement that he show irreparable injury").

[15] The County cites an outdated website to claim Texas Rope 'Em is only available in Austin, Texas—ignoring Andrew Couch's sworn testimony *and screenshots showing* the game available in Milwaukee's Lake Park, Couch Dec. ¶18, Motion & Brief at 14. To eliminate doubt, Candy Lab has filed the Declaration of Jacey Coen describing how he played the game in Lake Park.

[16] "[Section] 1983 was intended not only to provide compensation ... but to [deter] future constitutional deprivations .... The knowledge that a municipality will be liable for all of its injurious conduct ... should [incentivize] officials ... to err on the side of protecting citizens' constitutional rights." *Owen v. Independence*, 445 U.S. 622, 651-52 (1980) (cites omitted).

### IV. The Parties' and Public's Interests Weigh Heavily in Favor of an Injunction

"[T]he balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Higher Society*, *slip op*. at 5 (quotation omitted). Striking the Ordinance will not "stymie" the County in protecting its parks; it remains free to police park usage and to ticket law-breaking visitors exactly as it always has. Protectionist grousing over "California residents" accessing Milwaukee parks aside, the Ordinance regulates expression by *all* mobile AR creators—a $79 billion industry, Inbar Dec. ¶26, of vital "importance ... in contemporary society," *id*. ¶11—and impairs the First Amendment right of Milwaukee residents to *receive* such content.[17] Tolerating the Ordinance could encourage municipalities nationwide to adopt similar measures, undermining the entire medium.

### CONCLUSION

Candy Lab AR respectfully requests that the Court enjoin enforcement of the Ordinance.[18]


Dated: June 14, 2017

WARNER NORCROSS & JUDD LLP
By: /s/ Brian D. Wassom
Brian D. Wassom
Conor B. Dugan
Ashley G. Chrysler
2000 Town Center, Suite 2700
Southfield, MI 48075
248.784.5039
bwassom@wnj.com

---

[17] *U.S. v. Playboy Entm't Group*, 529 U.S. 803, 812 (2000); *Watseka*, 796 F.2d at 1556-57.

[18] The County says the Court may only enjoin enforcement against the named plaintiff, and not others. That is absurd. *Alvarez*, 679 F.3d at 608, which the County cites, does not prescribe that result. This is a facial, not just an as-applied, constitutional challenge to the Ordinance.

**CERTIFICATE OF SERVICE**

Tiffany Parrish states that on June 14, 2017, she caused to be served the foregoing document and this Certificate of Service on behalf of Plaintiff via the court's electronic filing system which will send notification of such filing to all attorneys on record.

I declare that the above statement is true to the best of my knowledge, information and belief.

*/s/ Tiffany Parrish*
Tiffany Parrish