# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CANDY LAB INC.,

                Plaintiff,

v.                                                              Case No. 17-CV-569-JPS

MILWAUKEE COUNTY,
MILWAUKEE COUNTY BOARD OF
SUPERVISORS, and MILWAUKEE
COUNTY DEPARTMENT OF PARKS,
RECREATION, AND CULTURE,                                       **ORDER**

                Defendants.

---

      This case concerns a location-based augmented reality ("AR") mobile application developed by Plaintiff Candy Lab, Inc. ("Candy Lab"). The app is a game is called "Texas Rope 'Em," and it is reminiscent of the traditional poker game from which its name derives. The game accesses the phone's rear-facing camera during gameplay and overlays visual elements onto the image of the real world as seen through the camera, including playing cards which the user can collect. Part of the game involves the user traveling to specific real-world locations to collect these cards, with the aid of the camera images and an in-game map.

      The first runaway hit in this game genre was Pokémon Go. Although its storyline is, of course, quite different, Pokémon Go has gameplay elements very similar to Texas Rope 'Em, including location-based and AR elements that require players to travel to real-world locations to play the game. Such locations include, at times, public parks owned and maintained by Milwaukee County.

Defendants, collectively referred to herein as "the County," say that while playing Pokémon Go, players trashed Milwaukee County parks, stayed after park hours, caused significant traffic congestion, and made excessive noise. Their impact ultimately cost the County thousands of dollars in increased police and park maintenance services. In response, the County adopted an ordinance (the "Ordinance") requiring those offering such games to apply for event permits and secure garbage collection, security, and medical services, as well as insurance. Offering a game without a permit can result in a fine or jail time.

Candy Lab wishes to offer Texas Rope 'Em to County residents to use in County parks. It does not want to apply for a permit to do so, nor incur the fees associated with obtaining the services necessary to secure a permit. Candy Lab brought this action challenging the Ordinance on the ground that it violates Candy Lab's First Amendment right to freedom of speech.

Presently before the Court is Candy Lab's motion for a preliminary injunction against enforcement of the Ordinance and the County's motion to dismiss the complaint for failure to state a claim. The motions are fully briefed and, for the reasons stated below, Candy Lab's motion will be granted and the County's motion will be denied.[1]

_____

[1] The County also filed a motion to stay these proceedings until at least October 2017. (Docket #23). The County argues that it plans to consider amending the Ordinance later this year and that this matter should be held in abeyance on the hope that some or all of Candy Lab's concerns may be mooted by a change in the Ordinance. Although the Court has the power to stay proceedings to promote efficiency and conserve scarce judicial resources, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 980 (7th Cir. 2005), neither goal would be served by a stay here. The Court is not inclined to delay the progress of this case on the mere possibility that some

# 1. BACKGROUND

## 1.1 Texas Rope 'Em and Augmented Reality Video Games

The relevant facts are not in dispute. Candy Lab is a company that has been developing location-based and AR software since 2011. Candy Lab not only creates its own applications but also licenses its proprietary software engine to others.

Location-based applications are those that track the real-time physical location of the device running the application, and allow the user to interact with digital content based on the device's geolocation. "Augmented reality" refers to the digital enhancement of physical senses, most commonly sight. Candy Lab's mobile applications augment reality by superimposing images on a live video display from a mobile device's rear-facing video camera, creating the illusion that the image is physically present on the other side of the device.

In July 2016, Pokémon Go arrived on the scene. This mobile game uses location-sensing technology and AR imagery to create a game world in which players interact with digital content in designated geolocations, called "game stops," and discover virtual creatures that are algorithmically generated in response to players' locations. Pokémon Go quickly became one of the world's most popular mobile game applications.

In March 2017, Candy Lab announced the launch of the first location-based AR poker game, Texas Rope 'Em. The goal of Texas Rope 'Em is to beat the dealer in the popular poker variant "Texas Hold 'Em." Players

---

unspecified amendments to the Ordinance may be considered at a later date. The tenuous potential benefit of the County's proposed stay, considered against the potential harm Candy Lab and others may suffer in the interim, counsels against staying the proceedings at this time. The motion will be denied.

begin the game with two of the five required playing cards. To build their hands, players must carry their mobile device to game stops indicated on the game map to obtain a new card. Once the player has set his or her hand, the cards are played against the dealer. If the player loses, he or she can try again. Players who beat the dealer win points and, in future versions of the game, will be able to win in-app bonuses or prizes. Candy Lab reports that none of these prizes will be worth money. *See* (Docket #18 ¶ 7).

Consistent with its name, Texas Rope 'Em has a Texas theme, including graphics and a color scheme that evoke the Wild West. When a player travels to a game stop and chooses a card to collect, the game generates an animated lasso that whips forward and grabs the selected card. Candy Lab's CEO describes this as reminiscent of "rustling up" cards like a cowboy would with cattle. *Id.* ¶¶ 5–6. However, there are no other characters in the game besides the player and the dealer, and the dealer is not itself represented or animated in any fashion. *Id.* ¶ 4.

Texas Rope 'Em is currently in "1.0" or "beta" form, meaning that although it is publicly available, its functionality is limited compared to the anticipated full public release. The game is currently playable in select cities, including Milwaukee, and is being actively showcased at technology events. The game is presently free to download and play, though later versions will likely offer in-app purchases.

### 1.2    Pokémon Go and the Rise of Discontent

The unanticipated popularity of Pokémon Go in July 2016 drew thousands of users across the country outside while playing the game. One member of the Milwaukee County Board of Supervisors (the "Board"), Sheldon Wasserman ("Wasserman"), says he received complaints that large numbers of people were playing the game in his district's Lake Park, some

of whom littered, trampled the grass and flowers, and stayed past park hours. There were also reports of inadequate bathrooms for parkgoers, unauthorized vendors in the park, parking violations, and significantly increased traffic congestion. Wasserman claimed that, as a result, the County was forced to spend tens of thousands of dollars on additional law enforcement and park maintenance services. *See* (Docket #2-1 at 2).

Wasserman proposed Resolution 16-637, which became Section 47.03(3) of the Milwaukee County Code of General Ordinances, to regulate games like Pokémon Go by targeting the companies that publish them. Multiple supervisors spoke against the Ordinance during deliberations, disputing Wasserman's claims about the game's impact. These officials argued that the gamers were not causing disturbances and that it was a positive development to see a diverse new group of people using the parks. They perceived the true driving force behind residents' complaints to be fear of the unknown and umbrage at an unanticipated increase in use of the nearby public parks.

Wasserman emphasized that the Ordinance was not directed against Pokémon Go players, but instead sought to regulate the businesses that profit from them. Wasserman believed that the Ordinance could help control the growing popularity of games like Pokémon Go and, perhaps more importantly, leverage that popularity to make money for the County, which was required to maintain the parks which were so heavily used during gameplay.

### 1.3    The Ordinance

On February 2, 2017, the Board adopted the Ordinance by a vote of 13–4. On February 20, the Ordinance was published and became effective. The Ordinance reads, in relevant part:

(3) Permits required for location-based augmented reality games. Virtual and location-based augmented reality games are not permitted in Milwaukee County Parks except in those areas designated with a permit for such use by the Director of the Department of Parks, Recreation, and Culture [(the "DPRC")]. Permits shall be required before any company may introduce a location-based augmented reality game into the Parks, effective January 1, 2017. The permitting application process is further described on DPRC's website for companies that create and promote such games. That process shall include an internal review by the DPRC to determine the appropriateness of the application based on site selection, protection of rare flora and fauna, personal safety, and the intensity of game activities on park lands. Game activity shall only occur during standard park hours, unless otherwise authorized by the DPRC Director, who has the authority to designate special events and activities within the Parks outside of the standard operational hours.

(Docket #2-1 at 4). The resolution adopting the Ordinance (but not the codified language itself) defines "virtual gaming" as "an activity during which a person can experience being in a three-dimensional environment and interact with that environment during a game, and the game typically consists of an artificial world of images and sounds created by a computer that is affected by the actions of a person who is experiencing it; and. . .[further provides that] Pokémon Go fits the characteristics defined by virtual gaming and is considered as such by the standards of the DPRC." *Id.* at 3. The Ordinance does not define the term "location-based augmented reality games," although it implies that Pokémon Go is such a game. *See id.* at 2.

The DPRC website notes that the "Milwaukee County Parks 2017 Special Event Application" (the "Permit Application") is required for "virtual gaming." The 10-page Permit Application requests a large amount

of information about a proposed event, such as estimated attendance, location within the park, event dates and times, a site map, and whether and how the event will be advertised. *See id.* at 16–26. It requires detailed plans for garbage collection, on-site security, and medical services, and warns that applicants will be responsible for these services. The Permit Application requires applicants to have liability insurance and make it available on-site for inspection. It also requires payment of several fees, and reserves to the DPRC the discretion to demand more information. Further, the Permit Application cautions that "[s]ubmittal of an application does not automatically grant [an applicant] a permit or confirmation to conduct your planned event." *Id.* at 18. Indeed, the Application warns that "Milwaukee County Parks in its sole discretion may grant, deny, revoke, or suspend any permit, at any time and for any reason." *Id.* at 21.

The Ordinance was codified at Section 47.03(3) of the County Municipal Code. Chapter 47 of the Code regulates County "Parks and Parkways." Section 47.29(1) specifies that the penalty for violation of a provision of that chapter is a fine of not less than $10.00 nor more than $200.00. A court may order up to ninety days of jail time if the fine is not paid. Additionally, police officers can arrest violators, and the DPRC can issue citations in addition to the penalties described in the municipal code.

In late March 2017, Candy Lab's CEO, Andrew Couch ("Couch"), contacted the County to explain Texas Rope 'Em and confirm that Candy Lab requires a Special Event permit before releasing its game to the public. DPRC Special Events Coordinator Ryan Broderick ("Broderick") responded, "you must complete the attached Special Event Application and submit with a map of all of the areas that you would like to add virtual gaming stops." Couch again responded to confirm that "[Candy Lab]

requires a Special Events permit before releasing Texas Rope 'Em to the public." Broderick said yes.

As of the date of this Order, Candy Lab has not applied for a permit, and the County reports that, as a result, it has not and currently is not enforcing the Ordinance against Candy Lab.

## 2. LEGAL STANDARDS

### 2.1 Motion for Preliminary Injunction

To obtain a preliminary injunction, a plaintiff must show that (1) he will suffer irreparable harm in the period before final resolution of his claims; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the court determines that the plaintiff has failed to demonstrate any one of these three threshold requirements, it must deny the injunction. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).

If the plaintiff makes these threshold showings, the court then assesses whether the balance of harms favors the plaintiff or the defendant and where the public interest lies. *Jones*, 842 F.3d at 1058; *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012). In so doing, the court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984); *Abbott Labs.*, 971 F.2d at 12. Overarching this entire analysis, the court should be mindful that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

### 2.2 Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of complaints which fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a viable claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, a complaint that offers "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* at 480–81.

### 3. DISCUSSION

The Court will frame its decision around Candy Lab's request for a preliminary injunction. As might be expected, the County's arguments for dismissal are identical to its arguments relating to Candy Lab's likelihood of success on the merits. Thus, the Court will fold its findings on the motion to dismiss into that portion of the discussion below.

Although a preliminary injunction requires several threshold showings, in First Amendment cases the availability of such relief normally turns on the plaintiff's likelihood of success. *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004). If this is shown, courts will generally presume that irreparable harm will occur in the absence of an injunction,

Case 2:17-cv-00569-JPS   Filed 07/20/17   Page 9 of 27   Document 27

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Citizens for a Better Env't v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir. 1975) (holding that even a "temporary deprivation" of First Amendment rights constitutes irreparable harm), that there is no adequate remedy at law, *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990), that the government will suffer no undue hardship from an injunction, *Joelner*, 378 F.3d at 620, and that the public interest favors an injunction, *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (7th Cir. 1998) (public interest always favors barring enforcement of an unconstitutional law).

Thus, the principal question presented is whether the Ordinance violates the First Amendment. Subsumed in this question are several others, including whether Texas Rope 'Em counts as protectable speech and how protections for video games under the First Amendment interact with park permitting schemes like that enacted in the Ordinance. These are multifaceted issues where little definitive guidance exists.[2] Nevertheless, the Court finds that Candy Lab has shown a sufficient likelihood of success to warrant preliminary injunctive relief.

### 3.1   Texas Rope 'Em Qualifies for First Amendment Protection

The Supreme Court has instructed that video games, like other forms of expression, are entitled to First Amendment protection. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011). Yet the County contends that Candy Lab's game does not warrant protection because it does not have sufficient expressive elements such as plot, characters, or dialogue, which the Court

---

[2]The legal academy is just beginning to tangle with the thorny questions raised by AR and virtual-reality technology. *See* Mark A. Lemley & Eugene Volokh, *Law, Virtual Reality, and Augmented Reality* (March 15, 2017), available at http://dx.doi.org/10.2139/ssrn.2933867.

in *Brown* recognized as important to the communication of ideas. *See id.* The game, in the County's view, is no more than a pictorial overlay on the real world to facilitate a card game; it communicates no ideas or messages. The County suggests that no case has extended the First Amendment to AR games, and that this Court should not be the first.

But the County fails to cite any case in which such protection was denied to an AR game, and in *Brown*, the Supreme Court spoke clearly: "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Id.* at 789 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). Having reviewed the evidence submitted, the Court is satisfied that Texas Rope 'Em has sufficient expressive content. The game immerses a player in a Western-themed virtual environment, complete with a Texas-themed game title, color scheme, and graphics, allowing the player to corral favorable playing cards using an animated lasso. The game conveys ideas related to the Wild West and scavenger hunting to lend an air of excitement and novelty to a traditional card game. Moreover, what Candy Lab's game lacks in compelling literary tropes, it makes up for by employing "features distinctive to the medium (such as the player's interaction with the virtual world)." *Id.* at 790. These include displaying card locations on a map on the user's phone, which the user must then physically navigate to and "grab" using the phone's camera.

Of course, the Seventh Circuit in *American Amusement Machine Association v. Kendrick*, 244 F.3d 572, 579–80 (7th Cir. 2001), attempted to distinguish between first-person shooting games that "used actors and

simulated real death and mutilation convincingly" from "games [that] lacked any story line and were merely animated shooting galleries." But Texas Rope 'Em is more expressive and interactive than a simple virtual card table, sweepstakes (using display elements mimicking casino games), *Telesweeps of Butler Valley, Inc. v. Kelly*, No. 3:12-CV-1374, 2012 WL 4839010, at *1 (M.D. Pa. Oct. 10, 2012), or bingo, *There to Care, Inc. v. Comm'r of Ind. Dep't of Revenue*, 19 F.3d 1165, 1167 (7th Cir. 1994). Moreover, the Supreme Court in *Brown* largely eschewed such aesthetic judgments, since the task of courts is not to act as critics. *Brown*, 564 U.S. at 790 ("Under our Constitution, 'esthetic and moral judgments about art and literature. . .are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority.'") (quoting *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000)). On the present record, the Court finds that Texas Rope 'Em contains at least the minimum quantum of expression needed to constitute protectable speech. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013) ("Even if *Madden NFL* is not the expressive equal of *Anna Karenina* or *Citizen Kane*, the Supreme Court has answered with an emphatic 'yes' when faced with the question of whether video games deserve the same protection as more traditional forms of expression.").[3]

Also specious is the County's contention that Texas Rope 'Em constitutes illegal gambling and is therefore unprotected by the First Amendment. The County asserts that the game represents an illegal lottery,

---

[3]Indeed, the Court in *Brown*, faced with gory, violent video games bordering on the "disgusting," held that "disgust is not a valid basis for restricting expression." *Brown*, 564 U.S. at 798. If disgust is not a good reason to prohibit speech, certainly the suggestion that Texas Rope 'Em is boring cannot be.

Case 2:17-cv-00569-JPS   Filed 07/20/17   Page 12 of 27   Document 27

which in Wisconsin consists of (1) a game of chance, (2) consideration, and (3) a prize. Wis. Stat. § 945.01(5)(a). According to the County, Texas Rope 'Em satisfies each element, since it is played by drawing cards at random and awards prizes to winners. It also provides Candy Lab with commercial benefit, both in terms of revenue for downloading the game and publicity through playing the game in public.

The current, early stage of development for the game, and the record as developed thus far, belies these contentions. First, downloading the game is free, and the game does not yet offer in-app purchases. The evidence presented suggests that at this time, there is no direct consideration to the developer, Candy Lab, when people obtain or play the game. Nor are "prizes" currently available for game winners, and certainly nothing of value as contemplated by Wisconsin law.

Most importantly, the Court is not convinced that Texas Rope 'Em can be fairly described as a game "determined by chance, even though accompanied by some skill," as required by Wisconsin law. *Id.* The game certainly involves randomly generated playing cards, but it rewards the skill and industry of the player in reacting to the virtual environment, seeking out additional playing cards, competing against others to reach game stops, and deploying cards strategically against the dealer. *See State v. Dahlik*, 330 N.W.2d 611, 618 (Wis. Ct. App. 1983) (finding that a lottery must be "predominantly controlled by chance"). Candy Lab's creation therefore surpasses *Telesweeps*, 2012 WL 4839010, at *1, which involved the virtual depiction of a wholly random, pre-determined sweepstakes result. *See also Serpico v. Vill. of Elmwood Park*, 799 N.E.2d 961, 968 (Ill. Ct. App. 2003) (in simulated gambling, "[t]he players unassumingly slide a token or coin into [the] machines and push a button or pull a lever, thereby surrendering

any control they may have over the sequence of events that, in the end, yield either fortune or loss").

Accordingly, the Court concludes that Texas Rope 'Em qualifies for First Amendment protection and that the County's motion to dismiss on that ground must be denied.

### 3.2 Candy Lab Has Shown a Sufficient Likelihood that the Ordinance Violates the First Amendment

Having determined that Texas Rope 'Em is entitled to First Amendment protection, the Court turns to how the Ordinance regulates it. Candy Lab asserts two broad types of claims: first, that the Ordinance as applied to it has chilled its exercise of First Amendment rights, and second, that the Ordinance is unconstitutional on its face and is therefore unenforceable against anyone. *See* (Docket #1 at 18–19). The Court is obliged to consider the as-applied attack first, since a finding that the Ordinance is unconstitutional as applied to Candy Lab would obviate the need for a broader constitutional ruling regarding the validity of the Ordinance as a whole. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989); *Commodity Trend Serv., Inc. v. Commodity Future Trading Comm'n*, 149 F.3d 679, 688 n.5 (7th Cir. 1988).

However, the Court need not tarry long over the as-applied challenge to find that it must address Candy Lab's claims of facial invalidity. The County argues that Candy Lab's as-applied challenge fails out of the gate because Candy Lab has not applied for a permit and, consequently, the County has not enforced the Ordinance against it. *See* (Docket #15-3). The County is correct in this regard. *See Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012).

Candy Lab, in turn, argues that this is irrelevant, since it need not subject itself to enforcement of the Ordinance in order to raise a facial challenge. (Docket #20 at 16–17). This too is correct. *Madigan*, 697 F.3d at 476; *Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649–50 (7th Cir. 2010). The evidence submitted by Candy Lab, in particular its correspondence with County officials, raises a "realistic danger" that the Ordinance will be enforced against it if it releases its game to Milwaukee County residents, as it plans to do. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). This is all that is required to establish Candy Lab's standing to mount a facial attack on the Ordinance.

The Court next considers the merits of Candy Lab's facial challenges. Coloring this analysis is the fact that the Court faces novel circumstances in this case—neither the Court nor the parties has the benefit of on-point authority concerning the propriety of an injunction against an ordinance which circumscribes the playing of AR mobile video games in public parks. With that in mind, the Court notes that Candy Lab raises three distinct claims: (1) that the Ordinance is an invalid prior restraint on speech; (2) that the Ordinance is impermissibly vague; and (3) that the Ordinance is overbroad. The Court need only analyze the first claim, as it is sufficient to warrant granting Candy Lab's motion.

The First Amendment accommodates reasonable restrictions on the time, place, and manner of speech, as long as they are (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v.*

*Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).[4] The threshold question, as in all First Amendment cases, is whether the challenged regulation is content-based. *See Playboy*, 529 U.S. at 813. If the regulation is content-based, it is subject to strict scrutiny; if content-neutral, it is subject to intermediate scrutiny. *Id.* On this issue, Candy Lab posits that because the Ordinance singles out AR games for increased administrative and logistical burdens, it discriminates against them based upon their content.

On the present record, the Court cannot agree. The Supreme Court held in *Hill v. Colorado*, 530 U.S. 703, 723 (2000), that a law which places no restrictions on a particular viewpoint or subject matter is content-neutral. As the Court explained, the fact that a County employee must review the content of a game to determine if it falls within the scope of the Ordinance does not in itself mean that the Ordinance is content-based. *Id.* To the contrary, the Ordinance can be interpreted and applied without reference to the subject matter of Texas Rope 'Em—*i.e.*, a Texas-themed poker game.

The Ordinance imposes restrictions on functionalities of games like Texas Rope 'Em, most importantly the fact that they are location-based. The Ordinance covers such games regardless of their content, be it poker, zombie-killing, or Pokémon-catching. As such, it cannot be said that the Ordinance applies to one game or another "because of the topic discussed

---

[4]Candy Lab asks the Court to analyze the Ordinance as a prior restraint on speech, while the County suggests that the Ordinance should be assessed according to the principles applicable to time, place, and manner restrictions. Certainly the jargon in this area can become confused, and the analytical frameworks often overlap. But the Seventh Circuit has instructed that permitting schemes, like the one at issue here, are to be analyzed as time, place, and manner restrictions. *MacDonald v. City of Chicago*, 243 F.3d 1021, 1031–32 (7th Cir. 2001); *Thomas v. Chicago Park Dist.*, 227 F.3d 921, 923–24 (7th Cir. 2000). The Court must use the prescribed framework.

or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 660 (1994) (holding that a "speech regulation that applies to one medium (or a subset thereof) but not others. . .'is insufficient by itself to raise First Amendment concerns'") (quoting *Leathers v. Medlock*, 499 U.S. 439, 452 (1991)). This distinguishes the present case from the ordinance at issue in *Reed*, where different restrictions applied to signage depending on whether the sign directed a person to an event, expressed preference for a political candidate, or expressed some other idea or message. *Reed*, 135 S. Ct. at 2227; *see also Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412 (7th Cir. 2015) (a city ordinance against panhandling was premised on "the topic discussed" by the speaker, *i.e.*, a plea for money).

Likewise, the history and purpose of the Ordinance do not reflect a content-based animus in the County officials who adopted it. Their aim was to prevent litter, vandalism, traffic, and other problems attendant upon AR games like Pokémon Go. There is no evidence that their decisions were premised on a dislike for Japanese art or culture any more than a desire to curb gambling or show distaste for Western aesthetics. *See Left Field Media LLC v. City of Chicago, Ill.*, 822 F.3d 988, 990 (7th Cir. 2016) (finding content-neutral an ordinance that "regulates peddling, without regard to what the peddler sells," whether it be "bobblehead dolls," "baseball jerseys," or printed matter). In short, nowhere in the Ordinance is there an indication that the County sought to agree, disagree, or otherwise express a view on the content of the AR games that might be played in its parks. *Reed*, 135 S. Ct. at 2227–28.

In this way, the Ordinance is similar to the anti-robocall statute challenged in *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305 (7th Cir.

2017), which was found content-neutral because it did not disfavor the nature of the call (such as to promote a political candidate) but the functionality of the call itself—a call placed by an automatic dialing machine resulting in a message from a robot. Even more apt is the district court's decision in *Ameritech Corp. v. United States*, 867 F. Supp. 721, 732 (N.D. Ill. 1994), which held that discrimination between interactive versus traditional television programming was not premised on the viewpoints or subject matter discussed in the programs themselves. So too, here, the Ordinance surely treats AR games differently from other mobile applications, but the distinction is the mode or channel of speech, not its content. *Compare City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993) ("[A] prohibition against the use of sound trucks emitting 'loud and raucous' noise in residential neighborhoods is permissible if it applies equally to music, political speech, and advertising."), *with Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (ordinance banning verbal, but not written, solicitation of money by street performers was unconstitutional because it depended on the contents of the speech even though it limited only the manner of expression).

To be sure, there is some appeal to Candy Lab's position on this question. Recall that *Brown* seems to treat the literary *and* interactive aspects (physical or virtual) of video gaming as an undivided, expressive whole. *See Brown*, 564 U.S. at 790. Taken to its furthest limit, this would mean that although the Ordinance does not care about the contents of the AR game being played, it is arguably content-based because it is directed at the physical act of game-playing, which is itself a part of the expression.

This was a suggestion, though only *dictum*, in Candy Lab's principal citation, *Weigand v. Village of Tinley Park*, 114 F. Supp. 2d 734, 737 (N.D. Ill.

Case 2:17-cv-00569-JPS   Filed 07/20/17   Page 18 of 27   Document 27

2000): "Indeed, the regulation might plausibly be argued to be content-based, not content-neutral, insofar as playing a game could be the content of the expressive activity." The Court does not adopt that position for the reasons stated above, in particular the fact that the Ordinance is undoubtedly content-neutral as to the message or idea conveyed by the games it regulates. Further, the parties have not directed the Court to clear authority instructing how to measure the expressive content of a video game. And *Brown* itself is of little help, since there the regulation was directed at "violent" video games, an undoubtedly content-based inquiry. *Brown*, 564 U.S. at 799. Consequently, on the state of the record and the authorities presented, the Court finds that the Ordinance is content-neutral.

Nevertheless, resolution of that question is not dispositive, as the Ordinance does not pass muster even under the more lenient standards applicable to content-neutral time, place, and manner restrictions. This is because the Ordinance does not employ sufficient procedural safeguards to ensure the protection of First Amendment rights. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002). Even content-neutral regulations "may not condition. . .speech on obtaining a license or permit from a government official in that official's boundless discretion." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 764 (1988); *Saia v. People of State of New York*, 334 U.S. 558, 560 (1948). An acceptable regulation must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323; *Niemotko v. State of Maryland*, 340

U.S. 268, 271 (1951); *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).[5]

Such standards are critical because even in cases where a regulation is content-neutral on its face, "placing unbridled discretion in the hands of a government official or agency. . .may result in censorship." *Lakewood*, 486 U.S. at 758. As the Court explained in *Lakewood*,

> Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*Id.* In other words, despite the apparently content-neutral nature of a permitting scheme, "[w]hen virtually unlimited discretion exists,. . .the possibility is too great that it will be exercised in order to suppress disfavored speech." *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 361 n.6 (7th Cir. 1997); *Boardley v. U.S. Dep't of Labor*, 615 F.3d 508, 517 (D.C. Cir. 2010). Additionally, unfettered discretion may lead to self-censorship, out of fear of denial of the ability to speak. *Lakewood*, 486 U.S. at 759; *see also Forsyth*, 505 U.S. at 133 n.10 (explaining that "the success of a facial

---

[5]Candy Lab argues that the Ordinance must contain the safeguards enumerated in *Freedman v. Maryland*, 380 U.S. 51, 58–60 (1965), which relate to judicial review of licensing schemes—in that case, a motion picture censorship statute. But in *Thomas* the Supreme Court explained that park permitting schemes are unlike licensing schemes. *Thomas*, 534 U.S. at 322. While the latter often carry self-evident censorship concerns which require prompt judicial review, permitting schemes applicable to all speakers (*i.e.*, content-neutral) do not so clearly raise the spectre of censorship. *Id.* Thus, *Thomas* defines less stringent safeguards necessary for permitting schemes. *Id.* at 323.

challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so").[6]

Under any reading of the Ordinance, no such standards exist. The Ordinance directs all prospective game publishers to complete the Permit Application. The Ordinance indicates that County officials will determine "the appropriateness of the application based on site selection, protection of rare flora and fauna, personal safety, and the intensity of game activities on park lands." (Docket #2-1 at 4). Yet the Permit Application is inconsistent with the idea that these criteria will limit a reviewing official's discretion, as it expressly warns that "Milwaukee County Parks in its sole discretion may grant, deny, revoke, or suspend any permit, at any time and for any

---

[6]Here again, overlapping analyses engender much confusion. The Court in *Thomas* stated that even a content-neutral regulation must place some boundaries on an official's discretion to avoid the danger that the regulation would be wielded in a content-based way. Yet the Seventh Circuit has folded the unbridled-discretion requirement *into* the requirement of viewpoint neutrality. *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 580 (7th Cir. 2002). The Court of Appeals reasoned that because the underlying concern in *Thomas* and its predecessors was a danger of viewpoint-based discretionary decision-making, failure to sufficiently fetter the reviewer's discretion meant that the law in question was not content-neutral. *See id.* This theoretical defense of the unbridled-discretion requirement seems at odds with the language of *Thomas*. Nevertheless, the Court need not waste time searching out the appropriate place for the unbridled-discretion requirement within the overarching analytical framework. Whether it is considered a part of viewpoint neutrality or a separate constitutional requirement, violating it renders a law facially invalid. *See id.*; *Thomas*, 534 U.S. at 323; *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009) (holding that, under *Thomas*, a content-neutral ordinance "(1) must contain adequate standards to guide the official's decision, (2) must not be based on the content of the message, (3) must be narrowly tailored to serve a significant government interest, and (4) must leave open ample alternatives for communication").

reason." (Docket #2-1 at 21).[7] Such unbridled discretion in the hands of a County official runs afoul of the Supreme Court's requirements for permitting schemes like that envisioned in the Ordinance. *See Niemotko*, 340 U.S. at 327 (finding that a licensing scheme granting the government "limitless discretion" is invalid); *MacDonald v. City of Chicago*, 243 F.3d 1021, 1026 (7th Cir. 2001) ("It is well established that where a statute or ordinance vests the government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech.").

Granted, the Permit Application itself notes some things that would subject an application to denial, such as failing to submit all required documentation or failing to provide proof of insurance. *See generally* (Docket #2-1 at 16–26). But the Application does not expressly mention the four specific matters listed in the Ordinance as being pertinent to applications submitted by AR game developers, casting doubt on the notion that those factors will actually cabin a reviewer's discretion. *See Lakewood*, 486 U.S. at 769 (striking down an ordinance which placed "no explicit limits on the Mayor's discretion").

Moreover, even if this discrepancy between the Ordinance and the Permit Application did not exist, the Ordinance's criteria are themselves too vague to afford adequate protection to free speech interests. In *Thomas*, the

---

[7]The County complains that its refusal to "guarantee approval cannot constitute unfettered discretion, for if approval was guaranteed, there would be no permit process at all." (Docket #15 at 18). This is simply untrue; where a regulation touches upon protected expression, it must include appropriate safeguards. Such was the case in *MacDonald*, where the ordinance was upheld in part because it "requir[ed] the Commissioner to grant a parade permit, unless specifically articulated public-safety concerns exist." *MacDonald v. City of Chicago*, 243 F.3d 1021, 1028 (7th Cir. 2001). By contrast, here the County does not have a default rule of permission.

Court upheld a permitting scheme which listed thirteen grounds on which a permit could be denied. *Id.* at 324. One such limitation forbade events that presented an "unreasonable danger to the health or safety of park users." *Id.* The Ordinance, by contrast, mentions that "site selection" is an issue of concern, but provides no guidance as to which sites within a park might be suitable for playing an AR game.

Likewise, upon reading phrases like "protection of rare flora and fauna" and "the intensity of game activities on park lands," how is a developer to know how much flower-trampling is too much, or what plants count as "rare," or what "intense" use of parklands entails? The Ordinance in effect states that County officials can consider protecting nature when reviewing a permit application, but there are no standards to guide either the applicant or the reviewer in this endeavor. This is not acceptable. *See Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 149–50 (1969) (overturning ordinance that required the city commission to issue a parade permit unless in "its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience required that it be refused").

Finally, it is worth noting that when the Ordinance simply lists "personal safety" as a relevant consideration, this falls appreciably short of the more robust criterion approved in *Thomas*: "unreasonable danger to the health and safety of park users." Whose personal safety? How severe must the danger be? The Ordinance, the Permit Application, and the County do not say. Put differently, while prohibiting "unreasonable" danger is allowed under the First Amendment, it does not follow that a nebulous consideration for "personal safety" is acceptable. *MacDonald*, 243 F.3d at 1028 (holding that even flexibly written criteria were permissible since they included limiting terms such as "substantially, "unnecessarily," and

"sufficient"). The Ordinance thus dooms itself in its failure to provide "narrowly drawn, reasonable and definite standards" to guide the County officials who must apply it. *Niemotko*, 340 U.S. at 271.[8]

This finding is enough to invalidate the Ordinance. In closing, the Court observes that the Ordinance suffers from other serious infirmities, most notably that it does not appear narrowly tailored to serve the interests it purports to promote. Here, the Ordinance is revealed for its strangeness and lack of sophistication. The Ordinance treats game developers like

---

[8] In *Lakewood*, the Court held that to overturn a licensing scheme admitting limitless discretion, the challenger must also demonstrate a "close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Lakewood*, 486 U.S. at 759. Yet *Thomas*, which found that any content-neutral regulation must place limits on discretion, mentioned no such nexus requirement. *Thomas*, 534 U.S. at 323. Whether and how the nexus requirement of *Lakewood* survives *Thomas* has not clearly been answered by any case the parties or the Court were able to find. The Seventh Circuit has applied the nexus requirement since *Thomas*, but has not done so consistently. *Compare Weinberg*, 310 F.3d at 1044 (straightforward discussion of nexus requirement), *with MacDonald*, 243 F.3d at 1026 (analyzing unfettered discretion issue without mention of nexus requirement).

But assuming that the nexus requirement applies here, it is satisfied. The *Lakewood* Court contrasted the regulation at issue in that case, concerning placement of newsracks, with a hypothetical regulation on the placement of soda vending booths. *Lakewood*, 486 U.S. at 760. While the placement of newsracks was closely related to the dissemination of the news, and therefore of central concern to the First Amendment, controlling where a soda vendor operates would have at most an incidental effect on whatever unrelated speech might occur around him. *Id.*

Here, the Ordinance adequately abuts areas of First Amendment concern—the expressive content of Texas Rope 'Em—so that *Lakewood* would permit a facial challenge to lie. The stakes here are not the incidental possibility of speech occurring at a soda counter; instead, the Ordinance seeks to curtail speech itself, or conduct associated with that speech. Thus, while the Ordinance's language and history are professedly content-neutral, the close relation between the Ordinance and protected expression, and the unfettered discretion that County officials enjoy in evaluating permit applications, "pose a real and substantial threat" that the censorship risks the *Lakewood* Court identified could arise. *Id.*

Case 2:17-cv-00569-JPS   Filed 07/20/17   Page 24 of 27   Document 27

Candy Lab as though they are trying hold an "event" in a Milwaukee County park. However, this misunderstands the nature of the problem, since Candy Lab's video game will not be played at a discrete time or location within a park. Requiring Candy Lab to secure insurance, portable restrooms, security, clean-up, and provide a timeline for an "event" is incongruent with how Texas Rope 'Em (or any other mobile game) is played.

Forcing a square peg in a round hole demonstrates a true lack of tailoring, much less "narrow" tailoring designed to address the County's interests as they might be affected by Candy Lab. *Ward*, 491 U.S. at 791. Rather than prohibit publication of the game itself, the County could address its concerns by directly regulating the objectionable downstream conduct. *Butler v. State of Michigan*, 352 U.S. 380, 383 (1952) (a state regulation cannot "burn the house to roast the pig"). This might include aggressively penalizing gamers who violate park rules or limiting gamers to certain areas of the park. Such measures would assuage the alleged evils visited upon the parks by gamers while stifling less expression than the Ordinance does. *See Smith v. Executive Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) ("A regulation 'need not be the least restrictive or least intrusive means' of furthering the government's interest (in this case the orderly use of its property), but at the same time the government 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'") (quoting *Ward*, 491 U.S. at 798–99).

The County's contention that its Ordinance solves the problems presented by AR games, (Docket #15 at 23–24), is irrelevant. This misses the operative question: whether less restrictive measures would be inadequate

as a substitute. *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) ("Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'") (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). It was the County's burden to show that less restrictive measures are insufficient, *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006), and it has not yet done so.

As a result, the Court finds that there is a reasonable likelihood that Candy Lab will succeed on its claim that the Ordinance violates the First Amendment on its face. The Court is therefore obliged to grant the motion for a preliminary injunction.

**4.    CONCLUSION**

For the reasons stated above, the Court finds that Candy Lab has satisfied the prerequisites for a facial challenge to the County's Ordinance. As a result, the Court will deny the County's motion to dismiss and, by separate order entered this date, it will enjoin the County from enforcement of the Ordinance until further order of this Court.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for preliminary injunction (Docket #6) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss the complaint (Docket #14) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Defendants' motion to stay discovery and hold in abeyance Plaintiff's motion for preliminary injunction (Docket #23) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 20th day of July, 2017.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge

Case 2:17-cv-00569-JPS   Filed 07/20/17   Page 27 of 27   Document 27